706 So.2d 593 (1998)
Nelda WARREN, Plaintiff-Appellant,
v.
Bruce W. EVERIST, M.D., Defendant-Appellee.
No. 30,187-CA.
Court of Appeal of Louisiana, Second Circuit.
January 21, 1998.
*594 Nelson, Hammons & Self by John L. Hammons, Shreveport, for Plaintiff-Appellant.
Noah, Smith & Newman by Elmer T. Noah, II, Monroe, for Defendant-Appellee.
Before WILLIAMS, STEWART and CARAWAY, JJ.
CARAWAY, Judge.
The plaintiff, Nelda Warren, appeals a jury verdict and judgment dismissing her claim that the defendant pediatrician was negligent in his treatment of the plaintiff's daughter, Jennifer Warren. After five years of intermittent rectal bleeding thought to be caused by benign juvenile polyps, Jennifer, at age sixteen, died as a result of adenocarcinoma, a colon cancer rarely found in children. We find no manifest error of fact or error of law in the record of the proceedings. Accordingly, we affirm.

Facts
On September 11, 1984, Nelda Warren brought her ten-year-old daughter, Jennifer, to Dr. Bruce Everist with a complaint of rectal bleeding and the appearance of blood in her stools for approximately one month. Dr. Everist performed a digital rectal examination as well as a complete physical and other tests. Finding no apparent source of the bleeding, one week later, after the bleeding continued, Dr. Everist referred Jennifer to Dr. William Lumpkin, a general surgeon.
On September 18, 1984, Dr. Lumpkin performed a rectal and proctoscopic examination. Finding nothing, he performed an air contrast barium enema that revealed a probable polyp in the sigmoid colon. He scheduled and performed surgery on Jennifer where he confirmed and removed the colonic polyp with a sigmoidoscope. The polyp was analyzed and determined to be a benign juvenile polyp.
Following her surgery, Jennifer had some additional bleeding complications due to the removal of the polyp and was kept at the hospital overnight. Dr. Lumpkin released Jennifer from his care and told Mrs. Warren that because the polyp was benign, there was no need for concern. He also told her that there could be some additional bleeding even after the polyp was removed, and unless there was serious bleeding or frequent bleeding, there was no reason for alarm. After the removal of the polyp, Jennifer had additional bleeding, but Mrs. Warren was not concerned due to the statements made to her by Dr. Lumpkin.
On August 1, 1985, approximately ten months after the surgery, Jennifer returned to Dr. Everist with a complaint of 103° fever, nausea, vomiting, and diarrhea with bloody stools the night before. She also reported that she had had blood in her stools several times since the operation. Dr. Everist did a complete physical and a rectal examination. He found no blood or polyp within the reach of his digital examination. She had gained 3½ pounds since her last visit. Her hemoglobin was 12.4, indicating that she was not anemic. Finding no blood and no anal fissures, a common cause of rectal bleeding in children due to constipation, Dr. Everist concluded, in addition to a diagnosis of a gastrointestinal virus, that the reported episodic bleeding was probably due to another benign juvenile polyp.
Both Mrs. Warren and Dr. Everist agreed in their testimony at trial that he told her the bleeding should be monitored, and if it became more severe or frequent, she was to let him know. Jennifer was instructed to report all episodes to her and him. Additionally, Dr. Everist also recalled at trial discussing with Mrs. Warren the likelihood that it was a juvenile polyp and further testing was an option. He did not recommend removal of the polyp, however, because polyps often resolve themselves by spontaneous necrosis, that is, they frequently become twisted and the polypal tissue dies, breaks off and is passed out of the body. Mrs. Warren, however, did not recall this additional discussion at trial.
*595 Jennifer did not see Dr. Everist again until September of 1989, some four years later. Mrs. Warren testified that she had called Dr. Everist on several occasions to report that Jennifer had rectal bleeding. Although she was not certain, she estimated the frequency of these calls at three or four times per year. She testified that Dr. Everist would ask several questions when she called, including questions about the color of the blood, the quantity and the frequency of the episodes of rectal bleeding. She said he reassured her that no further examination was warranted. Dr. Everist, and his nurse, Faye Forman, each testified that they did not recall speaking to Mrs. Warren by telephone. Dr. Everist does not have a policy of documenting all phone calls from patients.
After further visits to Dr. Everist and other doctors in 1989 reporting symptoms other than rectal bleeding, Jennifer underwent an operation on January 3, 1990, for what was thought to be a ruptured appendix. The operation revealed advanced adenocarcinoma in the form of a massive tumor on the colon encroaching upon many vital organs and vessels such that total removal was impossible and her chance of survival virtually non-existent. She was put on chemotherapy and narcotics for pain. Jennifer died six months later on June 17, 1990.
A medical review panel consisting of three pediatricians reviewing the plaintiff's claims against the defendant found that Dr. Everist's treatment of Jennifer Warren did not fall below the applicable standard of care. A jury agreed, finding that Dr. Everist was not negligent in his treatment of Jennifer Warren. Plaintiff's motion for JNOV was denied. Plaintiff now appeals both the judgment and the denial of the JNOV.

Discussion
During the trial, the testimony of the various medical experts reviewed the eleventh and twelfth editions of Nelson Textbook of Pediatrics, a highly respected medical treatise for pediatric care. Because of a change in the text in the discussion of juvenile colonic polyps in the twelfth edition published in 1983, the plaintiff argues that the standard of care for the diagnosis and treatment of such polyps changed and, in 1985, required the use of a colonoscopy to visualize the entire length of the colon upon Dr. Everist's diagnosis of a probable polyp. Moreover, plaintiff argues that the description of the standard of care contained in the twelfth edition became a joint stipulation by both parties during the course of the trial. We first address the issue of the stipulation.

Joint Stipulation
Because the language of the two texts of the Nelson treatise (reviewed further below) was the topic of much discussion by the experts, both the plaintiff and the defendant introduced excerpts from the treatise into evidence. Plaintiff now argues that these separate and unobjected to offerings of the text of the twelfth edition by both parties amounted to a joint stipulation that the standard of care described in the twelfth edition of the treatise controls the outcome of this case, citing Aycock v. City of Shreveport, 535 So.2d 1006 (La.App. 2d Cir.1988), writ denied, 536 So.2d 1223 (La.1989) and Comberrel v. Basford, 550 So.2d 1356 (La.App. 5th Cir.1989).
From our review of the expert testimony and the parties' introduction of the text of the pediatrics treatise, we find no joint stipulation of fact. We interpret the use of this treatise at trial as part of the data on which all the experts admittedly relied. As such, the treatise reflected data not entirely within the personal knowledge of the experts but "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" as permitted as a basis for expert opinion under La.Code of Evid. art 703. Likewise, the recognized authority of the Nelson treatise also qualified it to be introduced into evidence under the learned treatise exception to the hearsay rule. La.Code Evid. art. 803(18). Nevertheless, the texts of both the eleventh and twelfth editions of Nelson treatise were presented into evidence in the context of much conflicting discussion and explanation by the experts interpreting the technical expressions of the treatise and the overall subject matter for the diagnosis and treatment of polyps in children. While the text of the twelfth edition was undisputed and placed *596 into evidence, its interpretation in the context of the facts of this case was greatly disputed by the experts for each party. There was no joint stipulation by the parties laying to rest the issue of the standard of care by the mere reference to the twelfth edition of the treatise.

Standard of Care and Dr. Everist's Actions
In a medical malpractice action, plaintiff carries a two-fold burden of proof. Plaintiff must first establish by a preponderance of the evidence that the treatment fell below the ordinary standard of care expected in that medical specialty and then establish a causal relationship between the alleged negligent acts and the injury. La. R.S. 9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991).
Failure to detect a dreaded disease with tragic consequences is not per se an indication of malpractice. A physician's conduct is evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised. The physician will not be held to a standard of perfection nor evaluated with benefit of hindsight. Opinions from medical professionals are necessary for the determination of the applicable standard of care and if that standard was breached. The views and opinions of these expert witnesses, though not controlling, are persuasive. It is for the trier of fact to evaluate conflicting expert opinions in relation to all the circumstances of the case. Stein v. Insurance Corporation of America, 566 So.2d 1114 (La.App. 2d Cir.), writ denied, 569 So.2d 984 (La.1990); Gibson v. Bossier City General Hosp., 594 So.2d 1332 (La.App. 2d Cir.1991); Ogletree v. Willis-Knighton Memorial Hospital, 530 So.2d 1175 (La.App. 2d Cir.), writ denied, 532 So.2d 133 (La.1988).
The jury in this case heard testimony from several physicians and surgeons. All agreed that rectal bleeding in a child is an abnormal circumstance, yet not an unusual occurrence. The most common cause of rectal bleeding is anal fissures from complications of constipation. Benign juvenile polyps are also a common cause of rectal bleeding occurring in one out of one-hundred children.
Significant to the defense in this case was the further undisputed evidence that adenomatous polyps, which commonly lead to cancer in adults, are extremely rare in children. Except for a certain rare and inherited polyposis syndrome or multiple polyp condition in children, which predisposes them to the risk of colon cancer, the adenocarcinoma which killed Jennifer has rarely been reported in the medical literature. According to Dr. Robert Haynie, one of the three pediatricians on the medical review panel who testified at trial, adenocarcinoma is so rare in children that a pediatrician does not act on that concern. In Jennifer's case, because of her family history and the prior finding of a benign juvenile polyp, she was known not to be predisposed to the familial polyposis syndrome. Therefore, the defense witnesses asserted that Dr. Everist's 1985 diagnosis of another probable juvenile polyp raised no reasonable consideration of the threat of cancer.
The benign juvenile polyp was described in the medical testimony to be approximately the size of a small cherry on a stem connected to the wall of the colon. The bleeding associated with the polyp is usually not significant and the condition is normally painless. In the normal process of the bowel and stool, juvenile polyps most frequently twist off spontaneously. After children have had one benign juvenile polyp, the chance for development of other such polyps increases to fifteen percent.
Dr. John Herbst, the primary defense witness, testified that, based upon the above understanding of polyps in children, unless substantial hemorrhaging develops, it is within the reasonable standard of care for the pediatrician to simply observe and watch and wait to see if the situation will resolve itself. This is particularly true after one benign juvenile polyp has been previously removed and for those children, such as Jennifer, who are not predisposed to the risk of cancer based upon family history. Dr. Herbst also recognized and discussed the diagnostic procedures, such as the barium enema and colonoscopy, the latter of which, through the development in technology, was in greater use by 1985. Nevertheless, he testified that *597 it was reasonable for Dr. Everist to forego those tests and not to fully confirm through biopsy his 1985 diagnosis of a probable polyp, but to merely continue to observe the bleeding to allow it to naturally resolve.
Appellant argues that Dr. Everist negligently failed to utilize colonoscopy to visualize Jennifer's colon to locate the probable polyp which he diagnosed in 1985 and to biopsy or remove the polyp to confirm that it was not a pre-malignant adenomas. Appellant supported this view through the testimony of Dr. Lee Schwalben, an internist, and the following language in the twelfth edition of Nelson Textbook of Pediatrics:

Diagnosis may be made by rectal examination. About one third of these polyps are within reach of the examining finger, although they are difficult to feel. Most are visible on sigmoidoscopy as smooth, pedunculated lesions containing gray-white cysts. An air contrast barium enema may show lesions above the level of sigmoidoscopic examination. Fiberoptic colonoscopy, which allows for the visualization of at least the descending colon and often the transverse and proximal segments, is the preferred diagnostic procedure. When a polyp is observed at endoscopy, it should be biopsied to confirm its hamartomatous nature.

Treatment is conservative for this self-limited, non-malignant problem except in rare cases in which hemorrhage is life-threatening. If the polyp can be reached with forceps, it can be removed per rectum using a speculum. Experience with removing more proximal polyps via colonoscopy is increasing, but the use of the technique is not widespread. Laparotomy for polyp removal is recommended only for multiple proximal polyps if they cannot be adequately assessed and treated by colonoscopy. (Emphasis in text)
Although appellant insists that these expressions in the twelfth or 1983 edition of the medical text represent a dramatic change in the procedures for juvenile colonic polyps requiring the immediate use of the colonoscope, we note that the earlier edition written in 1979 also discussed the interplay between the conservative treatment method and the colonoscope as follows:
If beyond visualization by sigmoidoscopy, a double air/barium contrast study of the colon is the best method of demonstrating these mucosal lesions; if still present after prolonged observation by annual barium studies, it is best to remove the lesion, using a colonoscope.
Additionally, we note that both texts unmistakenly emphasize that juvenile colonic polyps have "no potential for malignancy" and most often "infarct and pass spontaneously."
From our reading of these medical texts and the discussion of all the experts in this case, we find that the jury was not clearly wrong in concluding that Dr. Everist did not negligently breach the standard of care. The conservative treatment, allowing for the bleeding to either end naturally or to become more pronounced and continuous, was firmly established as an acceptable standard of care since the medical risk involved only hemorrhaging and anemia and not cancer.
An absolute confirmation of the polyp's nature through its biopsy or removal using a colonoscope would only have occurred as merely an incidence of Dr. Everist's treatment of more severe bleeding, which the evidence showed never materialized after Jennifer's 1985 examination. While we accepted Mrs. Warren's accounts of certain intermittent bleeding in small amounts and her reports to Dr. Everist between 1985 and 1989, Mrs. Warren admitted that she and Jennifer had been fully alerted to the danger of more extensive and sustained bleeding episodes by their experience in 1984 and by the instructions from the doctors. Such extensive and sustained bleeding did not occur in the weeks immediately following Jennifer's 1985 visit to Dr. Everist and did not occur thereafter in a manner significant to alert Mrs. Warren or Dr. Everist and prompt the need for additional diagnostic intervention, which might have then included the invasive colonoscopy. On this record, we therefore affirm the jury's verdict.

The Trial Court's Rejection of JNOV
The JNOV is a question of whether the jury verdict, as a matter of law, is supported by any legitimate or substantial evidence. *598 The finding that the evidence was insufficient as a matter of law requires that there was no valid line of reasoning and permissible inferences which could possibly lead rational men and women to the conclusion reached by the jury. In applying this standard, the trial court may not substitute its judgment of the facts for that of the jury and must consider all the evidence in the light most advantageous to the party in whose favor the jury verdict was rendered, giving this party the benefit of every legitimate and reasonable inference that could have been drawn from the evidence. Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986).
We reject the plaintiff's argument that Dr. Everist was required by the circumstances presented in August of 1985 or the subsequent telephone calls from Mrs. Warren to order a colonoscopy or barium enema test on Jennifer. Accordingly, plaintiff's motion for JNOV, which was premised upon this theory, was properly denied.
For the reasons stated in this opinion, the judgment of the trial court is affirmed. Costs are assessed against the appellant.
AFFIRMED.