749 So.2d 926 (1999)
Sheila CORLEY, et al., Plaintiffs-Appellees,
v.
STATE of Louisiana, DEPARTMENT OF HEALTH & HOSPITALS, et al., Defendants-Appellants.
No. 32,613-CA.
Court of Appeal of Louisiana, Second Circuit.
December 30, 1999.
*928 John B. Saye, Monroe, Counsel for Appellants.
Edmund M. Thomas, Shreveport, Benjamin Paul Mouton, Baton Rouge, Counsel for Appellees.
Before BROWN, PEATROSS and DREW, JJ.
BROWN, J.
In this medical malpractice action, defendants, the State of Louisiana through the Department of Health and Hospitals and E.A. Conway Medical Center, have appealed the trial court's judgment in favor of plaintiffs, Sheila Corley (now Littleton), the surviving spouse, and Jerry Walter Corley, Jr., the surviving son, of the late Walter Corley. The primary issue on appeal is whether the trial court committed manifest error in finding that the physicians at E.A. Conway deviated from the applicable standard of care by failing to properly diagnose Mr. Corley's condition, a large cancerous mass in his mediastinum, during the course of their treatment of his low back pain. Finding that the trial court's conclusions are reasonably supported by the record, we affirm.

Factual and Procedural Background
Walter and Sheila Corley were married on January 20, 1984. At the time, they lived in Texarkana, Arkansas. Their son Jerry was born in July 1985. Later that year, the Corleys separated and were divorced. Some time thereafter, the Corleys reconciled and resumed living together, holding themselves out to others as a married couple. In February 1988, the Corleys moved to Mr. Corley's hometown of Ferriday, Louisiana. The Corleys were remarried in December 1988.
Neurofibromatosis, a disease of the peripheral nerves of the body, is a condition marked by the presence of numerous neurofibromas, which are tumors or growths arising from the Schwann cells which form the covering membrane or sheath of a nerve fiber. Persons with neurofibromatosis frequently have café au lait spots of varying sizes on their bodies as well. In addition, people afflicted with neurofibromatosis experience a significantly increased risk of developing cancer.
In 1978, Mr. Corley was diagnosed with neurofibromatosis and had four neurofibromas removed from his head, arm, hip and leg by a physician in Texarkana. Thereafter, a few months prior to his return to Louisiana in 1988, Mr. Corley, who had no other known health problems, began experiencing low back pain.
On February 11, 1988, Mr. Corley sought medical treatment from Dr. Maurice Gremillion, a family practitioner in Ferriday. On that date, Mr. Corley complained that he had been experiencing low back pain and abdominal discomfort for approximately four months. He also noted that he had intermittent right shoulder pain and trouble sleeping. At Mr. Corley's request, Dr. Gremillion ordered a total work-up which included x-rays of the lower spine, chest, kidneys and gall bladder, as well as an upper GI series. Dr. *929 Gremillion also prescribed Flexeril, a muscle relaxer, and Anaprox, an anti-inflammatory pain medication. Dr. Gremillion, feeling that Mr. Corley should be seen by a specialist, then gave him a written referral to E.A. Conway Medical Center in Monroe for an orthopedic evaluation.
E.A. Conway, which is part of the L.S.U. system, is a teaching facility staffed by permanent, full-time physicians as well as by doctors who are employed on a temporary, rotating basis as interns and residents following their graduation from medical school. The general operating procedure of E.A. Conway at the time of Mr. Corley's presentment was that all new patients, even those who have referrals to a specific service or department, first go through the emergency room. At that time, a patient is charted and evaluated by an emergency room physician. From there, the patient is either treated or referred to a specific clinic for further follow-up. In most cases, patients see different doctors each time they report to the hospital or one of its clinics.
On March 2, 1988, Mr. Corley, accompanied by Sheila Corley, reported to the E.A. Conway Emergency Room. The Corleys presented admitting personnel with all of Mr. Corley's records from Dr. Gremillion, including the x-rays and other test reports. Dr. Bruce Fuller, an emergency room physician, took a history from Mr. Corley and reviewed Dr. Gremillion's notes and the x-ray reports. He also conducted a routine physical examination and had x-rays made of Mr. Corley's low back. Notwithstanding the presence of several growths and café au lait spots on Mr. Corley's back and torso, Dr. Fuller was unaware that his patient had neurofibromatosis.
Dr. Fuller found everything to be within normal limits and it was his impression that Mr. Corley was suffering from low back pain based on minimal subjective complaints of pain. Dr. Fuller continued Mr. Corley on the medication prescribed by Dr. Gremillion and made an appointment for him with the Orthopedic Clinic on March 16, 1988.
On that date, Mr. Corley was seen in the Orthopedic Clinic by fourth year resident McIntyre Bridges. Dr. Bridges does not recall looking at or reading the x-rays or reports from Mr. Corley's previous examinations. Dr. Bridges conducted a physical exam, which was normal, and started Mr. Corley on a conservative course of treatment for low back pain. Dr. Bridges' notes from this date indicate his awareness of Mr. Corley's neurofibromatosis.
Mr. Corley was next seen on April 20, 1988 by Dr. David Mehta. At the time, Dr. Mehta was doing a surgical internship and was rotating through the Orthopedic Department. Dr. Mehta's notes reflect that his physical exam of Mr. Corley was normal, but that he felt that Mr. Corley had a posture problem and referred him to physical therapy for correction of his posture. Again, the notes do not reflect whether Dr. Mehta reviewed any of Mr. Corley's previous medical records, x-rays or reports.
On September 14, 1988, Mr. Corley was seen by fourth year surgical resident Keith White. On that date, Mr. Corley noted that his pain had worsened and was occasionally affecting his walking. Dr. White's examination yielded no objective findings of low back pain, but he did notice several café au lait spots indicative of neurofibromatosis so he ordered a CT scan of Mr. Corley's low back to rule out any neurofibroma changes in the nerve roots. Dr. Ellis, a radiologist at E.A. Conway, interpreted the CT scan as showing arthritis consistent with fibrosis or spinal stenosis and possible edema of the right L-5 nerve root, which, according to Dr. White, may or may not have been the cause of Mr. Corley's back pain. As with Drs. Bridges and Mehta, Dr. White did not review any of the previous medical records, x-rays or reports. Mr. Corley's last visit to E.A. Conway was September 21, 1988. On that date, Dr. White reviewed the results of the *930 CT scan with Mr. Corley, continued him on an anti-inflammatory drug and encouraged him to continue his back exercises. Dr. White instructed Mr. Corley to return to the clinic in three months.
Thereafter, on October 26, 1988, Mr. Corley, plagued by constant back pain and beginning to experience difficulty breathing, consulted Dr. Rick Maxwell, a chiropractor, who did a full spinal x-ray which revealed a markedly diminished right lung area. Dr. Maxwell sent Mr. Corley to his father, also a chiropractor, who confirmed that there was a potential problem with Mr. Corley's right lung and recommended that he see a pulmonary specialist.
On October 31, 1988, Mr. Corley presented to Dr. Gremillion complaining of chest congestion and shortness of breath. Dr. Gremillion diagnosed him with bronchitis and implemented treatment accordingly. Mr. Corley returned to Dr. Gremillion on November 14, 1988 with complaints of shortness of breath and marked weight loss. Subsequent diagnostic testing confirmed the presence of a very large mass in Mr. Corley's right chest.
Prior to his death on January 23, 1990, Mr. Corley received radiation and chemotherapy treatment at LSU Medical Center in Shreveport.
Thereafter, Mr. Corley's surviving spouse and son instituted the instant medical malpractice action seeking wrongful death and survival damages from defendants, the State of Louisiana through the Department of Health and Hospitals, E.A. Conway and LSU Medical Center. Plaintiffs alleged negligence on the part of E.A. Conway physicians in failing to properly diagnose Mr. Corley's condition. As for LSUMC, plaintiffs contended that their oncology staff improperly diagnosed and treated Mr. Corley's cancer.
Bench trial was held April 25-27, 1997. Thereafter, on December 21, 1998, the trial court rendered judgment in favor of plaintiffs and against E.A. Conway in the amount of $400,000. Plaintiffs' claims against LSUMC, however, were rejected. It is from this judgment that defendants, the State and E.A. Conway, have appealed.

Discussion

Liability

Trial Court's Findings
The following is excerpted from the trial court's written reasons for judgment:
... Mr. Corley was seen by three [four] different physicians at Conway Hospital, as per the routine or practice of this hospital. None of this would have the effect of lowering the standard of care that Walter Corley was entitled to receive in this case.
This Court is of the opinion that the physicians at E.A. Conway Medical Center fell below the standard of care when they failed to properly diagnose Walter Corley's condition. Evidence of it was there in Dr. Gremillion's x-rays and medical report when Mr. Corley first arrived at the hospital in Monroe. Simply put, these doctors failed to see what they should have seen.
Moreover, when Mr. Corley did not respond to conservative treatment, there had to be another explanation for his low back pain. The doctors ignored this and did not expand their inquiry, which they should have done under a differential diagnosis assessment. This also constitutes a deviation from the standard of care owed to Mr. Corley.
For this, Walter Corley was deprived of a significant chance of survival.

Applicable Legal Principles
In a malpractice action against a hospital, under the theory of respondeat superior, the standard of care and burden of proof involved is the same as for the physician whose activities are questioned. McCraw v. Louisiana State University Medical Center, 627 So.2d 767 (La.App. 2d Cir.1993), writ denied, 94-0001 (La.03/11/94), 634 So.2d 399; Bolton v. Louisiana State University Medical Center, *931 601 So.2d 677 (La.App. 2d Cir.1992). In a medical malpractice action against a physician or surgeon, the plaintiff must establish that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and also that a causal relationship existed between the alleged negligent treatment and the injury sustained. La. R.S. 9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La. 1991); Warren v. Everist, 30,187 (La. App.2d Cir.01/21/98), 706 So.2d 593, writ denied, 98-0477 (La.04/03/98), 717 So.2d 1132; McCraw, supra; Bolton, supra.
Failure to detect a dreaded disease with tragic consequences is not per se an indication of malpractice. A physician's conduct is evaluated in terms of reasonableness under the circumstances existing when his professional judgment is exercised. Warren, supra. The physician will not be held to a standard of perfection nor evaluated with benefit of hindsight. Id.; Iseah v. E.A. Conway Memorial Hospital, 591 So.2d 767 (La.App. 2d Cir.1991), writ denied, 595 So.2d 657 (La.1992).
Appellate review of the trial court's findings in a medical malpractice action is limited. The applicable standard of care is determined from the particular facts of a case, including evaluation of the expert testimony. Hebert v. LaRocca, 97-433 (La.App. 3d Cir.12/10/97), 704 So.2d 331. When the medical experts express different views, judgments and opinions on whether the standard was met in any given case, the reviewing court will give great deference to the trier of fact's evaluations. Evans v. Haynie, 26,135 (La.App.2d Cir.09/21/94), 643 So.2d 273, writ denied, 94-2589 (La.12/16/94), 648 So.2d 391; Beckham v. St. Paul Fire and Marine Insurance Co., 614 So.2d 760 (La. App. 2d Cir.1993); Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991).
It is for the factfinder to evaluate conflicting expert opinions in relation to all the circumstances of the case. Roland v. Tedesco, 616 So.2d 780 (La.App. 2d Cir. 1993), writ denied, 619 So.2d 579 (La. 1993). Credibility determinations, including the evaluation and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which will not be disturbed on appeal in the absence of manifest error. Martin, supra; Simmons v. West, 29,633 (La. App.2d Cir.06/18/97), 697 So.2d 688, writ denied, 97-2308 (La.11/26/97), 703 So.2d 647; Iseah, supra. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Martin, supra; Wells v. Lurate, 28,322 (La.App.2d Cir.05/08/96), 674 So.2d 1059, writ denied, 96-1858 (La.10/25/96), 681 So.2d 372.

Analysis
Defendants contend that the trial court committed manifest error in finding that the physicians at E.A. Conway deviated from the applicable standard of care in their treatment of Walter Corley. Specifically, defendants argue that plaintiffs failed to establish negligence on the part of E.R. physician Jeffrey Fuller as they did not present any evidence of the standard of care applicable to emergency room doctors. Defendants also urge that there is no evidence in the record to support the imposition of liability on E.A. Conway for negligence in failing to diagnose and treat Mr. Corley's condition.
We first note that, contrary to defendants' argument, the record contains sufficient evidence of the standard of care applicable to Dr. Fuller. It is well established that where medical disciplines overlap, it is appropriate to allow a specialist in one field to give expert testimony as to the standard of care applicable to areas of the practice of medicine common to both disciplines. See e.g., Leyva v. Iberia General Hospital, 94-0795 (La.10/17/94), 643 So.2d 1236; Richardson v. State, 98-918 (La.App. 3d Cir.12/09/98), 726 So.2d 417; *932 Kippers v. Corcoran, 97-870 (La.App. 5th Cir.01/27/98), 707 So.2d 463; Smith v. Juneau, 95-0724 (La.App. 4th Cir.04/09/97), 692 So.2d 1365; Ricker v. Hebert, 94-1743 (La.App. 1st Cir.05/05/95), 655 So.2d 493.
In fact, defendants themselves elicited testimony from Dr. Taylor, an orthopedic surgeon, and Dr. Goodman, an orthopedist, on the issue of the standard of care applicable to emergency room physicians. Notwithstanding the fact that plaintiffs did not have a witness testify specifically as an expert in emergency medicine, the record clearly supports a finding that the diagnosis and treatment of low back pain and neurofibromatosis is not peculiar to the practice of orthopedic medicine and that the testimony of the various expert witnesses (some of them orthopedists) in this case more than established the standard applicable to emergency room physician Dr. Fuller's care of Walter Corley.[1]
As for the remainder of defendants' argument on the issue of liability, we will examine in detail the expert testimony to determine whether in fact there is sufficient support for the trial court's findings.[2]

(1) Basic Medical Principles
Several of the expert witnesses testified to the following basic and general principles applicable to the practice of medicine. Specifically, these tenets relate to the duty of a physician to formulate and revise a differential diagnosis.
A physician is required to take a thorough history based upon a patient's presenting signs and symptoms. A physician is required to perform a physical examination based upon the patient's presenting signs and symptoms. If the findings from the medical history and physical exam support a diagnosis, one should be made and treatment instituted.
When, however, in treating a patient a diagnosis cannot be made, at that time a differential diagnosis should be made, which includes all reasonable, plausible and foreseeable causes for the signs and symptoms noted in the patient. After forming a differential diagnosis, it is the physician's duty to rule out all imminent, serious and life-threatening causes for the signs and symptoms. This includes performing or ordering diagnostic tests or studies which will assist in ruling in or out imminent, serious and life-threatening causes.
Physicians are obligated to rule out these imminent, serious and life-threatening causes first. Failure to eliminate these causes can subject a patient to a foreseeable risk of harm and would further constitute a breach of the applicable standard(s) of care.

(2) Testimony of Treating Physicians

(a) Dr. Bruce Fuller
Dr. Bruce Fuller was the emergency room physician who examined Walter Corley on his initial visit to the E.A. Conway Emergency Room. Dr. Fuller testified that when patients first present to E.A. Conway, they have to come through the emergency room, where a chart is established and they are evaluated. At that point, patients are either treated immediately or referred to a specific clinic for follow-up.
When Walter Corley presented to the emergency room on March 2, 1988, he brought a note from Dr. Gremillion, as well his medical records, x-rays and the *933 radiologist's findings. Dr. Fuller's note from March 2nd states that Mr. Corley had experienced low back pain for two months and that he had a significant work-up by a local doctor (Gremillion) for back pain, although everything was within normal limits. He further noted that Dr. Gremillion, in treating Mr. Corley, had prescribed Flexeril, a muscle relaxer, and Anaprox, an anti-inflammatory.
Mr. Corley related to Dr. Fuller that he had a steady ache in his lower back. Dr. Fuller's physical exam was normal; there was no pain, spasm, mass or heat when he palpated Mr. Corley's lower back. According to Dr. Fuller, Mr. Corley had a fairly normal back exam; his complaints of pain were not related to any particular objective finding.
Dr. Fuller testified that when a patient is referred for orthopedic consultation, it is standard for x-rays to be done at E.A. Conway. In Mr. Corley's case, because his complaint was low back pain, he ordered a lumbar series, which was fairly normal. Based upon his exam and the x-rays, Dr. Fuller's diagnosis was low back pain based on minimal subjective complaints of pain.
Dr. Fuller testified that he was concerned with Mr. Corley's history of at least two months low back pain. He stated that he had an impression rather than a true diagnosis. He admitted that had he made a diagnosis, he would have had to consider multiple other problems.
Dr. Fuller noted that low back pain can have several different causes and that a differential diagnosis would require more precise x-rays. Even if he thought that a more extensive work-up was needed, Dr. Fuller testified that he would have left that to the doctors in the Orthopedic Clinic.
As it was, he continued Mr. Corley on the medications that had been prescribed by Dr. Gremillion and scheduled an appointment for him with the Orthopedic Clinic. Despite having performed a physical exam of Mr. Corley, Dr. Fuller stated that he was unaware at the time he saw Mr. Corley that he had neurofibromatosis. Dr. Fuller did not recall whether he saw any café au lait spots on Mr. Corley's body. Dr. Fuller stated that even if he had known about the neurofibromatosis, his treatment of Mr. Corley would have been the same. On cross-examination, however, Dr. Fuller admitted that had he known on March 2, 1988 that Mr. Corley had neurofibromatosis and had received treatment for this condition in the past, he would have had to include cancer or spinal tumors as part of a differential diagnosis.

(b) Dr. McIntyre Bridges
Dr. McIntyre Bridges was the first doctor in the Orthopedic Clinic to treat Walter Corley. Dr. Bridges stated that he had no recollection whatsoever of Mr. Corley, but that apparently he saw him once on March 16, 1988. At that time, Dr. Bridges, a fourth year resident, was doing an orthopedic rotation. According to Dr. Bridges, he was basically independent when it came to treatment and diagnosis in the Orthopedic Clinic; unless he asked for help, he was "on his own." In the instant case, from his review of the medical records, Dr. Bridges noted that at no time did a staff (permanent and supervising) physician see, treat or consult about Mr. Corley.
Mr. Corley related a history of low back pain for three months and that he had neurofibromatosis. Dr. Bridges' physical exam revealed no neurological defect. Dr. Bridges prescribed Flexeril and Naprosyn and two weeks bed rest and advised Mr. Corley to return to the clinic in a month. His notes don't show whether he had the E.R. doctor's work-up or any x-rays. Dr. Bridges stated that he usually records in his notes the information that he has and that he would have looked at the x-rays had they been a part of his chart. At his deposition, Dr. Bridges looked at the chest film and gall bladder series ordered by Dr. Gremillion and noted a soft tissue density at T-10-11.
*934 On cross-examination, Dr. Bridges noted again that he did not remember Mr. Corley at all and could only testify about what he wrote in his notes. According to Dr. Bridges, they saw, an average of 30-40 patients a day in the Orthopedic Clinic; he related that "they come through there in great numbers and we saw one after another." Dr. Bridges stated that low back pain is a big work-up and that he probably spent 15-20 minutes with Mr. Corley.
Dr. Bridges testified that if he had taken a history and learned that Mr. Corley had had back pain for more than three months and if he had the films/reports and knew what had been done previously, it probably would have changed his thinking and would have made him look more toward a chronic as opposed to an acute problem. Further, had he known about the complete work-up done by Dr. Gremillion and had this information to review, he probably would have done things differently, such as obtaining a more extensive history, ordering an MRI, CT scans, etc. Dr. Bridges stated that he was working in a vacuum regarding previous history and that he had no information other than that provided by the patient.
Dr. Bridges was unaware that Mr. Corley had reported abdominal pain to Dr. Gremillion. Had he had this information, along with that noted above, he would have formed a differential diagnosis which would have included both chronic and acute low back pain syndrome, trauma, inflammation, neoplasms, congenital defects, metabolic diseases, degenerative disorders, neurologic disorders, referred pain and psychological problems. He also acknowledged that he would have taken a different approach had he known that he was not the original treating physician, but was instead a subsequent doctor as a result of referral.
According to Dr. Bridges, one of the things you have to worry about with a patient with neurofibromatosis is that malignant neurofibromas grow rapidly. Therefore, when there is a neurofibroma with rapid growth, it is probably malignant. Neurofibromatosis is a serious condition; cure rates are unbelievably low, although the disease is treatable.
Dr. Bridges, who was not an orthopedic specialist, stated that had he known of Mr. Corley's history, he would have ordered a CT scan confined to his lumbar region. In fact, Dr. Bridges stated that the standard of care would require such an x-ray. Dr. Bridges also acknowledged that Dr. Gremillion requested that Mr. Corley see an orthopedic specialist and that the residents who saw Mr. Corley were not orthopedic specialists. Dr. Bridges did not know whether an orthopedist would have ordered a more extensive CT scan which would have included the T-10 level rather than limiting it to the lumbar spine.
Later in his testimony, notwithstanding his previous assertion that Mr. Corley's records from the E.R. at E.A. Conway were not available to him, Dr. Bridges stated that he was not certain that he did not in fact review these records. He may have seen them, but he could not say for sure one way or the other. However, since the lapse in time between Mr. Corley's work-up in the E.R. and his first orthopedic appointment was two weeks, Dr. Bridges felt it was likely that the E.R. record, including the x-ray ordered by Dr. Fuller, was a part of the medical records available to him when he treated Mr. Corley. Dr. Bridges also conceded that Dr. Fuller's report refers to attached notes, x-rays and x-ray reports, which indicates that in addition to the E.R. record, Dr. Bridges had available Dr. Gremillion's records and work-up.

(c) Dr. David Mehta
Dr. David Mehta, the next physician to examine Walter Corley, stated that on April 20, 1988, he was a surgical intern doing a one-month rotation in orthopedics. Like Dr. Bridges, he did not recall seeing Mr. Corley, and in testifying, relied upon his notes from April 20th. On that date, Mr. Corley reported for follow-up *935 for chronic low back pain. A physical exam showed no neurological deficits. Dr. Mehta felt that Mr. Corley's problem was possibly related to poor posture, so he sent him the physical therapy department. However, Dr. Mehta also noted that poor posture can be a symptom rather than a cause of back pain.
Dr. Mehta testified that his notes do not indicate whether Mr. Corley's record included previous medical records, x-rays and reports, or if it did, whether he reviewed these prior materials. Dr. Mehta acknowledged the general rule in medicine that if it is not noted in the records, it did not happen. According to Dr. Mehta, previous medical history or records are not reviewed on every visit or by every physician. It was the duty of the initial treating physician in the Orthopedic Clinic (Dr. Bridges), if the x-rays from Mr. Corley's prior treatment were available with his chart, to either review the x-rays or have someone read them prior to making his diagnosis and beginning the patient's course of treatment.

(d) Dr. Keith White
On September 14 and 21, 1988, his third and fourth visits to the Orthopedic Clinic, Walter Corley was treated by Dr. Keith White, a fourth year resident in general surgery. Unlike Drs. Bridges and Mehta, Dr. White remembered Mr. Corley because of his neurofibromatosis. Dr. White observed no objective findings consistent with low back pain as a result of his examination.
Dr. White noted that nowhere in Mr. Corley's record does it indicate that anyone at E.A. Conway read the x-rays from Dr. Gremillion; he doesn't recall seeing these films. Dr. White testified that he was unaware of Mr. Corley's prior complaints (to Dr. Gremillion) of right back pain and abdominal discomfort and he likewise was not cognizant of the fact that Mr. Corley's low back pain had persisted for four months prior to his initial presentment to E.A. Conway.
Despite this lack of knowledge, however, Dr. White noted that by September 14, 1988, Mr. Corley's condition had become chronic. At this time, the differential diagnosis had to be expanded to include or exclude other causes. Specifically, Dr. White was concerned with Mr. Corley's complaints of increased pain and occasional difficulty walking; the chronic nature of his condition; the failure to resolve with conservative management; and, his neurofibromatosis. Dr. White felt that it was possible that Mr. Corley's problem was caused by a neurofibroma with nerve root involvement in his lower back.
Because he considered the chronic nature of Mr. Corley's complaint, together with the neurofibromatosis, to be a red flag, Dr. White ordered a CT scan of Mr. Corley's lumbar region. At that time, his differential diagnosis included a possible Schwann cell tumor caused by Mr. Corley's neurofibromatosis.
The CT scan showed a possible neurofibroma, but it also showed signs that were more consistent with arthritic changes. Thus, it was Dr. White's opinion that the likely cause of Mr. Corley's back pain was these arthritic changes. Dr. White conceded that tumors as high as T-10 can cause low back pain and difficulty walking and that his work-up did not go as high as the T-10 level, which is where Mr. Corley's large tumor was. Had the CT scan been more inclusive, the tumor would have shown up on the x-rays. Dr. White also acknowledged that the findings from the CT scan were not really consistent with serious back pain.
When shown the gall bladder series from Dr. Gremillion's work-up, Dr. White stated that he could see a soft tissue density approximately three or four centimeters in density at T-10. He was also able to see this mass on the chest x-ray ordered by Dr. Gremillion.
On direct examination, Dr. White testified that Mr. Corley had no complaints of chest or arm pain, shortness of breath, or congestion; in short, he had no complaints *936 related to the thoracic region. Dr. White reiterated that there was nothing in Mr. Corley's presentation which would indicate a tumor in the mediastinum as a cause of his low back pain. When asked whether, if he had to see Mr. Corley again today, he would do anything different, Dr. White stated that he would have ordered the same CT scan, performed the same exam and found the same thing he did in September 1988. Basically, Dr. White didn't feel that the two conditions, low back pain and a mediastinal tumor, were related, but instead were two concurrent, simultaneous yet different pathological conditions. The only things that indicated the tumor, in retrospect, were the gall bladder series and chest x-ray, but even had he seen them, Dr. White opined that he would have read the mass as a pericardial fat pad rather than as a tumor.[3]
Dr. White admitted that if the CT scan done on September 14, 1988 had included the thoracic region rather than being limited to the lumbar area, the tumor would have shown up. Statistically, Mr. Corley would have had a better chance of surgical resection (removal) and recovery. This would also have been true had the earlier x-rays from Dr. Gremillion been read correctly.
Dr. White noted that as a treating physician, when x-rays or other tests are presented, that doctor has an obligation to read them if he is able and to have them read by someone who can read them if he is unable to do so. According to Dr. White, this is within the requisite standard of care.

(e) Dr. George Ellis
Dr. George Ellis is the E.A. Conway radiologist who reviewed the CT scan of Mr. Corley's lower lumbar spine ordered by Dr. White on September 14, 1988. In reviewing his report, Dr. Ellis noted that he found evidence of arthritis and some nerve irritation, as well as spinal stenosis at the L-5 level which was markedly constricted and compressing the nerve. He also found fibrosis (or scarring) which can occur from any irritation of the nerve root, not just from trauma.
While Dr. Ellis was unaware that Mr. Corley had neurofibromatosis, he noted that this knowledge would have made no difference in the way he read the x-rays. When shown the films from Dr. Gremillion's work-up, like Dr. White, he would have interpreted the small density shown on the chest x-ray as a cardiac fat pad. In retrospect, however, he knows it was probably the mediastinal mass. As for the gall bladder series, Dr. Ellis stated that in retrospect, the soft tissue density was easy to see, but that it would have been easy to overlook under the circumstances in which it was originally read.
As for subsequent CT scans, Dr. Ellis noted that they showed that the tumor, although it surrounded and probably infiltrated the walls of the heart and aorta, did not grow out of or encroach upon the spine, which looked normal. Again, it was Dr. Ellis's opinion that the tumor did not involve Mr. Corley's spine.

(f) Dr. Gary Smith
Dr. Smith is the internist to whom Mr. Corley was referred by Dr. Gremillion in November 1988. Dr. Smith opined that had he been the initial treating physician, when Mr. Corley presented to him with complaints of low back pain and a history of neurofibromatosis, he would have done physical and neurological examinations and obtained some back films to look for bony changes or erosion.
Dr. Smith stated that, like Dr. Gremillion, he would not have pursued anything related to the neurofibromatosis any further absent some specific complaints that could have been attributed to a specific nerve or group of nerves. Recognizing *937 that people with neurofibromatosis have an increased risk of developing tumors, both benign and malignant, Dr. Smith stated that if Mr. Corley's back pain did not respond initially, he probably would have ordered some bone scans, then referred him to an orthopedist for further evaluation. Absent some specific complaints by the patient regarding his chest or some indication in his physical exam, Dr. Smith would not have ordered a chest x-ray. Furthermore, without such symptoms, Dr. Smith would not attribute Mr. Corley's low back pain to his subsequent pulmonary problems.

(3) Testimony of Expert Witnesses

(a) Dr. Richard Schoendinger
As one of their expert physicians, plaintiffs called Dr. Richard Schoendinger, who was accepted as an expert in orthopedics and orthopedic surgery. In forming his opinions relative to this case, Dr. Schoendinger relied primarily on Walter Corley's medical records.
Dr. Schoendinger stated that as an orthopedic surgeon, he is familiar with neurofibromatosis. He noted that while there is no curative treatment for neurofibromatosis, neurofibromas can be and are often surgically removed. In defining the standard of care, Dr. Schoendinger noted that a physician with a patient who has neurofibromatosis should provide that patient with a general description of the disease process and possible symptoms, including the potential for malignant degeneration of neurofibromas. Failure to do so would in Dr. Schoendinger's opinion constitute a breach of the standard of care. Based upon his review of the records, Dr. Schoendinger stated that there is no indication that any of the doctors at E.A. Conway disclosed this basic information to Mr. Corley.
In orthopedic care, x-rays are an important diagnostic tool and the standard of care requires physicians to read x-ray films. Dr. Schoendinger opined that it is not suitable treatment to rely on the report of another doctor; he feels that an orthopedist should read the x-rays on his own or obtain a consult from a radiologist. Furthermore, if a physician is presented with x-rays from prior treatment of a patient, the standard of care requires him to read and review these films. If there is a soft tissue mass on a film, an orthopedist or radiologist should be able to see it; failure to do so is a breach of the applicable standard of care. If there is an abnormality on the film which is outside the area of specialty or general medicine, the physician has a duty to refer the patient.
According to Dr. Schoendinger, if the x-rays brought by Mr. Corley to E.A. Conway on March 2, 1988 show a paraspinous mass at T-10-11, in light of the patient's history of neurofibromatosis, a physician reading these x-rays (i.e., the examining doctor) had an obligation to advise Mr. Corley of the abnormal finding and refer him. Failure to either recognize the mass or to recognize then advise and refer the patient would be a breach of the standard of care. Specifically, when a patient such as Walter Corley is referred to a hospital for further evaluation or treatment by an orthopedic specialist, and brings with him x-ray films, these films should be read by the initial physician or by a radiologist at the doctor's request. Again, failure to read the films or refer them to a radiologist is a breach of the standard of care.
Also, the standard of care requires a physician to elicit specific information regarding the location of pain. Dr. Schoendinger's review of the records shows that none of the E.A. Conway doctors adequately described Mr. Corley's complaints; this is a breach of the standard of care. Dr. Schoendinger noted that he could not determine from the E.A. Conway medical records the location of Mr. Corley's pain; all of the notes state simply "low back," which, according to the witness, is a fairly broad area.
Dr. Schoendinger stated that a para-spinal mass at level T-10-11, if large enough, can cause pain to be felt from the *938 rib cage down the low back. Such a mass can also cause a person to experience difficulty walking.
According to Dr. Schoendinger, by the time Mr. Corley's complaints of persistent back pain had reached the six month mark with no improvement despite conservative treatment, particularly considering his neurofibromatosis and the fact that his pain had worsened and he had begun to experience difficulty walking, it was incumbent upon the treating physician to expand the level of inquiry to include other areas of the body. Specifically, Dr. Schoendinger opined that it was time to move outside the area of his low back.
Dr. Schoendinger testified that it was a breach of the standard of care for Dr. White to order a CT scan limited to Mr. Corley's lumbar area. Instead, in accordance with the above principles, Dr. White should have ordered a CT scan of Mr. Corley's dorsal spine, which would have included the T-10 level. This was especially critical given Mr. Corley's neurofibromatosis, which required that Dr. White rule out the presence of a tumor/neurofibroma on his spine.
Dr. Schoendinger reviewed Dr. Ellis's report regarding the September 14, 1988 CT scan and noted findings consistent with back pain, i.e., arthritic changes or fibrosis/spinal stenosis. However, he emphasized that these findings did not necessarily rule out other causes for back pain. According to Dr. Schoendinger, it is possible that, based on the information in that report and the clinical picture Mr. Corley presented, a paraspinal mass higher up on the spine was causing his pain.
On cross-examination, Dr. Schoendinger stated that after reviewing that portion of the record detailing Dr. Fuller's care of Walter Corley, he did not feel that Dr. Fuller deviated from the standard of care in any way at that point in time.
When asked whether it was the duty of an orthopedic specialist to review IVP or gall bladder films, Dr. Schoendinger stated that it was not; he stated, however, that a physician should secure a consult for anything outside his area of practice. Dr. Schoendinger also noted that if a physician is unaware of previous x-ray films or they aren't included in the record, he can't review them or refer them for a consult.
Dr. Schoendinger conceded that it is possible that Walter Corley had two conditions which were totally unrelated: the degenerative changes in his spine as shown on the CT scan and a mass in his mediastinum. When asked whether he felt that the mass in Mr. Corley's chest caused or was related to his low back pain, Dr. Schoendinger stated that on that issue he had no opinion.

(b) Dr. Don Holton
Plaintiffs also presented the expert testimony of Dr. Don Holton, a diagnostic radiologist. Dr. Holton reviewed the various x-ray studies that were taken of Walter Corley, as well as the depositions of the physicians involved in his care.
After reviewing the x-rays ordered by Dr. Gremillion in February 1988, Dr. Holton noted that while the lumbar spine x-ray showed only a suggestion of a paraspinous mass at T-10-11 on the right, this mass was readily apparent on the gall bladder study. This is a significant finding because it indicated some sort of soft tissue growth along Mr. Corley's spine on the right side just below and behind the heart. There is no reference to this mass in Dr. Brown's (the original radiologist's) report.
Dr. Holton conceded that the mass at 10-11 was only visible at the top of the lumbar x-ray and that his analysis was made in retrospect with the benefit of hindsight. Dr. Holton also noted that had he been the initial radiologist interpreting the film, he might have missed the mass as well because it is in the part of the film that is usually covered by the viewing box.
The chest x-ray done in February 1988 also shows the mass; what the radiologist labeled a cardiac fat pad in the right cardiophrenic angle is probably the paraspinous *939 mass. Again, Dr. Holton acknowledged that without any other knowledge, this could easily have been read by Dr. Brown as a fat pad.
Dr. Holton did, however, opine that the radiologist who read the gall bladder study erred by failing to observe the mass which was clearly visible in this film. Furthermore, upon such a finding, it was incumbent upon the radiologist (and subsequent treating physicians) to investigate further. Dr. Holton was adamant that even without the benefit of hindsight, the doctors who looked at the gall bladder film should have noted the paraspinous mass. Dr. Holton further pointed out that the gall bladder film was especially significant given the size and location of the paraspinous mass and the fact that it was found in someone so young. According to Dr. Holton, although the work-up was ordered in connection with Mr. Corley's complaint of low back pain, radiologists are trained to look at everything an x-ray shows, not just the area of complaint.
Dr. Holton next noted that according to the note made upon Mr. Corley's initial visit to E.A. Conway, he brought the workup, together with Dr. Gremillion's records, with him. Dr. Holton found no fault on the part of Dr. Fuller (or on the part of the physicians who treated Mr. Corley in the Orthopedic Clinic) in accepting the conclusions of the interpreting radiologist, Dr. Brown. He also found no deviation from the standard of care in Dr. Fuller's ordering a lumbar spine x-ray on Mr. Corley's initial visit.
However, Dr. Holton stated that he "wasn't impressed" with the findings from the CT scan done in September 1988. Dr. Holton disagreed with Dr. Ellis's conclusion of fairly marked arthritis. According to Dr. Holton, the results of this study did not show a plausible cause for Mr. Corley's chronic back pain. Instead, based upon Mr. Corley's history (chronic low back pain, worsening of complaints and neurofibromatosis) and what the gall bladder film showed, he feels that the CT scan should have been ordered for the whole spine, not just the lumbar area. Specifically, Dr. Holton believed that the neurofibromatosis should have put one of the E.A. Conway doctors on notice to look elsewhere since Mr. Corley's problem was not getting resolved. Dr. Holton reiterated that because there was nothing on the lumbar CT scan which could have been the cause of Mr. Corley's persistent low back pain, the treating physicians should have looked elsewhere. By September 1988 at the latest, Dr. Holton feels that this should have been done, especially in light of Dr. White's concern with Mr. Corley's neurofibromatosis.
Dr. Holton next pointed out that neurofibromatosis is a condition generally known across all fields of medicine. Also well known is that one of the dangers associated with this disease is malignant transformation. Notwithstanding his above opinion, Dr. Holton felt strongly that if the other doctors who treated Mr. Corley at E.A. Conway knew about the neurofibromatosis, which the notes shows was the case, they had a duty to order further tests, particularly since conservative treatment did not work. Upon their discovery of Mr. Corley's neurofibromatosis, whether by review of medical history or by physical exam, their differential diagnosis should have been expanded.
When asked about the duty of E.A. Conway regarding interpretation of Mr. Corley's previous x-rays (those ordered by Dr. Gremillion), although Dr. Holton found no error on the part of the physicians in accepting Dr. Brown's findings, he did feel that these x-rays should have been independently reviewed by the Radiology Department at E.A. Conway. According to Dr. Holton, this should have been done initially upon Mr. Corley's presentment, then again in comparison with any x-ray studies done at the hospital. Had all of the prior x-rays been read by the Radiology Department, the gall bladder series should definitely have raised questions of whether there was a paraspinous tumor *940 and given that, a closer scrutiny should have been made of the other findings. At that point, it would have been the duty of the interpreting radiologist to notify the treating physicians of the possibility of a paraspinous tumor.
On cross-examination, Dr. Holton conceded that his opinion regarding what the radiologists at E.A. Conway should have done was based upon his assumption that the x-rays were left at E.A. Conway as testified to by the Corleys and as indicated in the medical records. If the films were not left at the hospital, however, then "it's a whole new ball game." Dr. Holton reiterated that when a referring physician sends films, the initial doctor should either review the x-rays or have them read by radiology.

(c) Dr. Leonard Goldman
Dr. Goldman, a surgical oncologist, served as a member of the medical review panel that exonerated LSU Medical Center. Called by defendants to testify, Dr. Goldman stated that he reviewed all of Mr. Corley's medical records, not just those related to his care at LSUMC. Assuming that Mr. Corley complained of low back pain on his right side near his hip, in Dr. Goldman's opinion, the tumor that he was treated for at LSU probably did not cause his low back pain.

(d) Dr. Christopher McDonald
Dr. McDonald, a medical oncologist, also served on the LSUMC medical review panel. Dr. McDonald testified that his practice has included the treatment of mediastinal tumors and that he feels it is unlikely that a tumor in the mediastinum can cause low back pain.

(e) Dr. Gary Burton
Dr. Burton, Director of the Inpatient and Outpatient Oncology and Hematology Clinics at LSUMC, was involved in Walter Corley's treatment at that facility. According to Dr. Burton, Mr. Corley's tumor was above T-12; based upon its location, as well as the chronic nature of his low back pain, the tumor could not have directly caused his low back pain. Also, the symptoms that indicate a mediastinal mass, such as a feeling of fullness and shortness of breath, were not present in Mr. Corley until after he ceased treatment at E.A. Conway.

(f) Dr. Randolph Taylor
Dr. Taylor, an orthopedic surgeon, served on the medical review panel that exonerated E.A. Conway. Dr. Taylor first opined that, given his review of the March 2, 1988 notes, Dr. Fuller's treatment of Walter Corley upon his initial presentment to the emergency room was within the applicable standard of care. He also found no deviation from the standard of care by the physicians who treated Mr. Corley in the Orthopedic Clinic.
Specifically, as to Dr. White, who in September 1988 ordered a CT scan confined to L3-4, L4-5 and L-5-S1, Dr. Taylor opined that this decision was appropriate, given that Mr. Corley's complaints were confined to his low back area. Dr. Taylor stated that had he been the treating physician, he would not have ordered the test any sooner because ordinarily, conservative treatment and physical therapy are tried first before further evaluation is needed.
In reviewing the September 1988 CT scan, Dr. Taylor noted the radiologist's findings of marked facet arthritis at L-5 and right lateral spinal stenosis with possible edema of the right L-5 nerve root. He also noted an apparent increase in soft tissue density in the right aspect of the spinal canal which he attributed more likely to fibrosis than disc herniation. Dr. Taylor testified that both spinal stenosis and facet arthritis can cause low back pain. It was Dr. Taylor's opinion that the facet arthritis, which was on the same side as Mr. Corley's low back pain, was the cause of his pain. According to Dr. Taylor, there was nothing to indicate that any further testing should have been done at that point; the CT scan covered the part of the spine where his complaints arose and possible *941 causes for this pain were revealed in the CT scan.
From Dr. Taylor's understanding of where the mediastinal mass was, he doesn't think it was the cause of Mr. Corley's low back pain; the mass was in the front part of the chest, not back on the spinal cord or on one of the nerve roots. Had Mr. Corley had a tumor impinging upon his spine, he would have had markedly different symptoms, such as chest pain or pain toward the front of his abdomen.

(g) Dr. Carl Goodman
Dr. Carl Goodman, an orthopedic specialist, also served on the E.A. Conway medical review panel. Dr. Goodman agreed with Dr. Taylor that there was no deviation from the applicable standard of care by Dr. Fuller. He also opined that the treatment Mr. Corley received in the Orthopedic Clinic fell within the standard of care.
Specifically, Dr. Goodman stated that, considering Mr. Corley's complaints of increased low back pain and occasional problems walking, together with his neurofibromatosis, Dr. White's treatment, including the CT scan limited to the lumbar area, was in accordance with the applicable standard of care. A lumbar CT scan would either indicate or rule out a number of possible causes for low back pain, such as a ruptured disc, a pinched nerve, bone spurs, a tumor or infection.
The CT scan ordered by Dr. White revealed spinal stenosis, facet joint arthritis and a possible bulging disc, all which are possible causes of low back pain. Dr. Goodman reiterated that, given the results of the CT scan, together with Mr. Corley's history and Dr. White's physical exam, nothing Dr. White did was a deviation from the standard of care.
Dr. Goodman testified that in his experience, he has not seen low back pain caused by tumors in the mediastinal region. Instead, it is his opinion that Walter Corley had two unrelated conditions: low back pain and a mediastinal tumor. Again, Dr. Goodman pointed out that during the time of his treatment at E.A. Conway, Mr. Corley exhibited no symptoms (shortness of breath, difficulty breathing, tightness in chest) which would have alerted the doctors that there was a problem in his thoracic area.
Considering the above conflicting testimony, we cannot say that the trial court committed manifest error in finding that the physicians at E.A. Conway deviated from the applicable standard of care in their diagnosis and treatment of Walter Corley. As stated previously, as an appellate court, we are required to give great deference to the findings of fact when medical experts express different views, judgments and opinions on whether the standard of care was met in a particular case. While we might differ in our factual conclusions had we been sitting as the trial court, in accordance with the requisite standard of review, we are compelled to affirm the trial court's findings.

Plaintiffs' Entitlement to Damages
Although they have not appealed as excessive the damage awards made to Sheila Corley (Littleton) and Jerry Corley, defendants assert on appeal that neither plaintiff is entitled to damages arising out of Walter Corley's death. Their reasoning is as follows: Because Walter and Sheila Corley were not married when Mr. Corley was treated at E.A. Conway, she is not entitled to damages as a result of his wrongful death. Likewise, defendants argue that Jerry is not entitled to recover for his father's wrongful death because he had been legally adopted by his mother's new husband at the time of trial.
These arguments are without legal merit. First, according to the clear terms of La. C.C. art. 2315.2, a cause of action for the recovery of wrongful death damages vests in favor of the surviving spouse and child on the date of death of the spouse or parent. The only relevant time for the determination of the relationship between potential claimants and the decedent is the date of death. For purposes of a wrongful death action brought *942 pursuant to Article 2315.2, it is irrelevant what the relationship between the claimants and the decedent was at an earlier time, such as at the time of the act or omission which caused or set in motion the death, or a later time, such as the filing of suit or subsequent trial.[4] See Dean v. State of Louisiana, Department of Transportation and Development, 32,816 (La. App.2d Cir.12/08/99), 749 So.2d 846.

Conclusion
For the reasons expressed above, the trial court's judgment is AFFIRMED. Costs of this appeal, to the extent allowed by law, are assessed against defendants, the State of Louisiana through the Louisiana Department of Health and Hospitals, and E.A. Conway Medical Center.
NOTES
[1] In particular, we note the statement by plaintiffs' expert in orthopedic oncology, Dr. Lawrence Weis, that there are many things that orthopedists do in the normal course of their practice that bridge a number of medical specialties, such as the treatment of back pain.
[2] Plaintiffs have not appealed the trial court's determination that there was no malpractice on the part of the physicians who treated Walter Corley at LSUMC. Thus, except as it pertains to the issue of the negligence of E.A. Conway, we will not discuss the evidence related to Mr. Corley's treatment at LSUMC.
[3] A pericardial fat pad is a benign band associated with the pericardial sac and the top of the diaphragm.
[4] In some cases, the chronology of the relationship may be of some significance.