704 So.2d 331 (1997)
Joey HEBERT, Plaintiff-Appellant,
v.
Dr. Henry LaROCCA, et al., Defendant-Appellee.
No. 97-433.
Court of Appeal of Louisiana, Third Circuit.
December 10, 1997.
*332 J. Jake Fontenot, John Blake Deshotels, Mamou, for Joey Hebert.
Charles Archibald Boggs, Anne Medo, New Orleans, for Dr. Henry Larocca et al.
Before DECUIR, PETERS and GREMILLION, JJ.
PETERS, Judge.
The plaintiff, Joey Hebert, filed this medical malpractice suit to recover damages that he claims to have suffered as a result of the negligent placement of metal plates during a lumbar fusion surgery performed on his lower back by Dr. Henry LaRocca and Dr. H. Ulrich Bueff. Named as defendants were Dr. LaRocca and his malpractice insurer, St. Paul Insurance Company; the unopened succession of Dr. LaRocca;[1] and Dr. Bueff. The claim against Dr. LaRocca and his insurer was transferred to Jefferson Parish after consideration of an exception of improper venue. The matter went to trial against Dr. Bueff, and after trial, the trial court rendered judgment finding no negligence on the part of Dr. Bueff and thereby dismissed Hebert's suit. Hebert appeals this judgment, asserting several assignments of error.
In January 1987, Hebert sustained an injury to his lower back, and in July of that same year he reinjured his lower back. Dr. Arthur Flick, a Ville Platte, Louisiana physician, concluded that Hebert had suffered a ruptured disc in his lower back. In October 1987, Dr. Flick treated Hebert's injury by a procedure known as a percutaneous discectomy.[2] This procedure was unsuccessful, and six days later, Dr. Flick performed an open laminectomy at L5-S1 on the left side.
Subsequently, Hebert again developed a severe pain in his back which radiated into *333 his legs. According to Hebert, Dr. Flick suggested that he undergo lumbar fusion surgery. However, Dr. Flick left the Ville Platte area, forcing Hebert to search for another doctor to perform the fusion operation.
Hebert contacted Dr. LaRocca's office in New Orleans, Louisiana, in 1989 to set up an appointment. In September 1989, after running numerous tests, Dr. LaRocca also concluded that Hebert was an excellent candidate for fusion surgery. The surgical procedure and risks associated therewith were explained to Hebert, and initially he chose not to have the surgery. He later reconsidered, and on October 23, 1990, extensive surgery on his lower back was performed by Dr. LaRocca at the Elmwood Medical Center in Jefferson Parish. The insertion of spinal plates to stabilize the spine during the fusion process was a part of the surgery performed on Hebert at that time. According to Dr. LaRocca, Hebert suffered from lumbar spondylosis,[3] facet arthropathy, and a recurrent herniated disc. Dr. LaRocca described the procedure performed on Hebert as a "lumbar laminotomy with foraminotomy." In describing this procedure, Dr. LaRocca stated the following:
Laminotomy means make an opening into the spinal canal wherever required, which in this case was at four locations, right and left at two levels. Foraminotomy means to enlarge the foramen where the nerve was, and that's to address both spinal stenosis and epidural fibrosis. The next component is intervertebral disc excision. That's to address the disc rupture. A ruptured disc, herniated disc, if I use those two terms synonymously, those have to come out because they're actually taking up space that isn't tolerated. The next component is called neurolysis. These nerves are bound and scarred. Neurolysis means to release the scar about the nerve to attempt to liberate the nerve. Next component is AO Fixation, that means the insertion of spinal plates to immobilize the spine. And lastly, fusion using pelvic bone graft.
He went on to say that:
The initial component of the operation is to get the canal completely clean. And, you know, that can take an hour or two hours, whatever it takes is what it takes. And that's where the foramen is widened. That's where scar tissue is taken away. That's where disc ruptures are taken out, and things of that character. And that's got to be all finished before you go on with the fixation. Another thing though, in order to do a proper fixation, you are passing screws down cylinders of bone, you want to see those cylinders so that you know if your screw is cutting out. So, the bony removal that occurs before the fixation not only frees the nerves, it allows you to see that bone, the pedicle it is called. It's a cylinder of bone. And that's where the screw goes.
Dr. LaRocca testified that his "pre-operative diagnosis and the post-operative diagnosis were exactly the same, indicating that everything suspected was found and there were no surprises."
At the plate fixation stage of the procedure, a wire nail or pin is passed into the pedicle. The pedicle is then x-rayed to ascertain the wire's position and to make sure that the pin is wholly enclosed within the pedicle. This is a critical step in the procedure as the screws which hold the radiographic plates in place are intended to be screwed along the same track as the inserted pin. If the screws are not properly aligned, the stability of the fusion can be compromised. Additionally, if the screws penetrate the bone, they may impinge on the underlying nerve. If done properly, the procedure will result in stability of the spine to allow the creation of a solid fusion of the patient's spine at the level where the damage was located.
To properly accomplish the surgical procedure, it is necessary for physicians to be on *334 either side of the patient to reduce the procedure time and thus also reduce the chance of infection. Dr. Bueff assisted Dr. LaRocca in Hebert's operation and did participate in the insertion of the screws which secured the plates to the pedicle on one side, probably the right.[4]
According to Hebert, the surgery did not immediately alleviate his pain. He testified that, after his surgery, he awoke in a "great deal of pain" in his back and legs, with the right leg hurting the most. Although neither Dr. LaRocca nor Dr. Bueff found his complaints to be abnormal, Hebert remained in the hospital for over five days, and he asserts that he continued to be in severe pain.
Hebert next visited Dr. LaRocca's office on November 16, 1990, and saw a Dr. Fairbanks on that day. According to Dr. LaRocca's office records, Dr. Fairbanks recorded that Hebert complained of back pain, and Dr. LaRocca did not find that unusual. In fact, according to Dr. LaRocca, if he did not have pain "that would almost be miraculous."
On January 30, 1991, Hebert was seen in Dr. LaRocca's office by Dr. Bueff. After listening to Hebert's complaints and examining him, Dr. Bueff concluded that there was need for additional diagnostic studies and ordered that a CAT scan and EMG be performed. On March 7, 1991, these tests were performed. According to Dr. LaRocca, the EMG revealed "a right L4 nerve involvement which had not been present on the prior two studies." He concluded that the CAT scan was normal at L3-4 but at "L4 there was deviation or medial direction of the screw on the right side." When Hebert returned on March 22, 1991, he was informed of these findings and was told that "the right L4 screw should come out" because of the right leg pain and the EMG finding of L-4 nerve involvement which had not been previously present. Dr. LaRocca was of the opinion that the right back and leg pain was caused either because "the fusion was not going to take" or that the L-4 screw "could be penetrating the cortex." In either event, it was his opinion that the "right-sided hardware" needed to be examined.
A second surgery was performed on March 28, 1991, at which time Dr. LaRocca removed the right pedicle screw and plate at the L-4 level. Dr. Bueff did not participate in this surgery. Dr. LaRocca testified that Hebert's pain was caused, not from the pedicle screw and plate, but from scar tissue that had formed around the nerve. Additionally, he found that the screw was at all times enclosed within the pedicle and never impinged on the nerve. Hebert stated that, after this surgery, he felt "a lot better" and his pain was greatly relieved.
The sole issue in this litigation concerns the placing of the pedicle screws on the right side in Hebert's back. In October of 1990, Hebert filed a petition for review to the Medical Review Panel claiming that Dr. Bueff breached the standard of care required of him in placing the screws in his back in a fashion as to permanently damage his spinal cord and in failing to notice the improper placement of the right L-4 pedicle screw used to secure the right plate in the fusion procedure. He also claimed acts of malpractice on the part of Dr. LaRocca relative to the same procedure, but those are not before us. The Medical Review Panel determined that neither physician breached the applicable standard of care.
After trial of this suit, the trial court determined that Dr. Bueff was not negligent under the circumstances of the case in that he did not breach the standard of care required of him. In its extensive reasons for judgment, the trial court concluded the following:
Dr. LaRocca dictated what part Dr. Bueff was to play in this surgery under Dr. LaRocca's direction and supervision. Dr. LaRocca decided the type of surgical procedure to be performed, how it was to be accomplished, the methods used in checking to see if it was being done properly, et cetera. Dr. Bueff had absolutely no authority in these areas nor the ability to override LaRocca's decision. He was there to assist and perform only those functions he was told to do. Dr. LaRocca ordered the x-rays and the angle of the *335 views to be taken. He went behind Dr. Bueff with his little probe to ascertain whether the screws were in place totally within the bone and he himself stated after the x-rays were presented to him and he had reviewed them that he was satisfied with the placement of the pedicle screws. Again, there was no evidence that Dr. Bueff found anything out of the ordinary which he failed to report to Dr. LaRocca. All of the physicians for plaintiff and defendant agree that the standard of care places the responsibility upon Dr. LaRocca. That quite apparently is the standard of care, therefore, the Court must find Dr. Bueff free from malpractice under these circumstances. I can not conceive of a case that could be more closely supervised and scrutinized by the chief surgeon. In every case the Court has reviewed that approached this degree of supervision by the chief surgeon, it is the chief surgeon who was held liable for any malpractice.
In his appeal, Hebert assigns five issues for review or assignments of error. Four address the legal standard of care applicable to Dr. Bueff and whether he violated that standard, and the fifth addresses the question of damages.
The standard of care required of licensed physicians is set forth in La.R.S. 9:2794. That statute reads in pertinent part as follows:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
At the time of Hebert's October 1990 surgery, both Dr. LaRocca and Dr. Bueff were orthopaedic surgeons. Thus, Hebert has the burden of proving the standard of care ordinarily practiced by orthopaedic surgeons relative to this procedure.
Dr. LaRocca was a nationally recognized orthopaedic surgeon who had a sub-specialty expertise in spinal surgery. He used this expertise as a teaching tool through the Tulane University School of Medicine in New Orleans, which offered a one-year fellowship program, known as the Fellowship in Spinal Surgery, wherein other orthopaedic surgeons were offered the opportunity to study spinal surgery techniques under his direction. Dr. Bueff had been accepted in the fellowship program and began his training on July 1, 1990.
Although Dr. Bueff had eleven years of orthopedic training and had just completed his residency at Yale University, he had not yet attained the expertise necessary to perform the spinal surgery techniques taught by Dr. LaRocca, including the procedure performed on Hebert. Dr. Bueff testified that he had participated in spinal surgery using internal fixation devices on only a few occasions prior to his fellowship training and that before Hebert's surgery, he had assisted Dr. LaRocca in approximately twenty to twenty-five such procedures. While considering himself competent to assist Dr. LaRocca, Dr. Bueff did not feel that he had yet attained sufficient expertise to perform the procedure as the primary surgeon. In describing the fellowship program, Dr. Bueff stated:
A fellowship is a kind of apprenticeship. There is a surgeon who lets me participate in his clinic, seeing patients prior to surgery, he shows me ways to examine a patient, teaches me things about x-rays, and then in the decision making he tells me who could benefit from surgery and who would benefit from conservative treatment. In the operating room its again the apprenticeship situation that the surgeon shows me how to do surgery, what to do right, and usually you learn just by assisting him. He operates on his side then shows me how to do my part of the surgery on the other side.
*336 Thus, the purpose of the fellowship program was for Dr. LaRocca to teach Dr. Bueff spinal surgery techniques. Dr. Bueff's participation was limited to watching Dr. LaRocca perform the procedure and performing those tasks assigned to him by Dr. LaRocca while under Dr. LaRocca's direct observation, instruction, and supervision.
Dr. LaRocca confirmed this teaching approach in the fellowship program. He testified that "[Dr. Bueff] certainly did not do anything that was not directed and observed by me." Additionally, according to Dr. LaRocca, the degree of involvement of the fellowship pupil depends on the amount of time the pupil has been in the program, but most of all, on the "complexity of the surgery." When asked to rate Hebert's surgery on a scale of one to ten, Dr. LaRocca rated it a twelve.
Dr. David Aiken, a Metarie, Louisiana orthopaedic surgeon, also testified about the nature of the fellowship program. After a five-year residency in orthopaedic surgery at Oschner Hospital in New Orleans, Dr. Aiken completed a fellowship with Dr. LaRocca during the last six months of 1983. When asked to explain what a fellow who is an assistant surgeon would do for Dr. LaRocca in the operating room, Dr. Aiken responded as follows:
Well, Dr. LaRocca would make all the decisions about what was gonna be done. He might tell me, get these tests done on this patient and lets go over the patient and he'd examine the patient and then he'd say, where are these tests, and I'd put all the tests up, maybe on a view box, cause a lot of them are films, and he'd say well, look at this, this and this, and he might say to me, what do you think we ought to do? And I'd say, well, this is what I'd do, and it really didn't matter what I said we thought we ought to do, that was just a learning exercise. And then he would tell me what he was gonna do.
While he noted that inserting the screw in the pedicle was a simple mechanical operation, he opined that it was Dr. LaRocca's responsibility not only to chose the proper procedure to be performed and to decide where the screws were to be placed, but it was also his responsibility to ensure that the procedure was performed correctly. He testified that he was not aware of any recognized standard of care applicable to fellowship participants in particular. His review of the medical evidence caused him to conclude that neither Dr. LaRocca nor Dr. Bueff committed malpractice in their treatment of Hebert.
Dr. John E. Cobb, an orthopaedic surgeon who removed the left plate and screws from Hebert's back on May of 1992, also testified as to the division of responsibility between Dr. LaRocca and Dr. Bueff. In response to a question concerning that division of responsibility, he responded as follows:
I think the staff physician is responsible, certainly if he is present, if there are cases where a fellow is doing, in his absence, then I think probably the fellow would be the primary physician. But in my experience the staff physician is always responsible for all events and outcomes that occur when he is the chief surgeon in charge.
Dr. Jack Moshein, a Los Angeles, California expert in lumbar fusion surgery, testified on behalf of Hebert that there is no national standard of care for physicians in fellowship programs, and that the physician's responsibilities would depend on standards within the area in which he is trained. In commenting on Dr. Bueff's responsibilities, he stated that:
He is a fellow and maybe he didn'tat that point in your training, you may not have had that much responsibility in reading films and things. Doing pedicle screws is not an easy job, and it's a very difficult job. But it boils down to the fact that as far as I'm concerned medicallynot legally, medicallyDr. Bueff, as a fellow, had no responsibility for what happened in this case. And even if he did or did not see the film or did or did not recognize the screw, I still don't feel that he is to blame. It's Dr. LaRocca's position as a chief that he is to look at the film, and he makes the determination of whether that is in or out and does or does not [do](sic) something about it, not Dr. Bueff.
He went on to testify that Dr. Bueff's responsibility is only to report to Dr. LaRocca anything that he might question in the *337 procedure, and if Dr. LaRocca does not agree that anything is wrong, "that's the end of it."
Thus, the undisputed expert testimony concerning the standard of care applicable to a physician studying under a fellowship program is that he or she is to follow the instruction and direction of the teaching physician, perform those tasks assigned under the direct supervision and control of the teaching physician, and report to the teaching physician anything which appears improper or out of the ordinary. This standard does not preclude the fellow's obligation to question improper procedures, but once questioned, the full responsibility rests on the teaching physician.
Hebert asserts that expert testimony describes only a medical standard and not necessarily a legal one. He argues that we should impose a greater standard on Dr. Bueff than that imposed by the medical profession. In support of his argument, Hebert cites several cases for the proposition that La.R.S. 9:2794 has been extended to provide that nurses, assistant surgeons, other medical personnel (such as a radiologist, technician, and attendant), medical resident students, and biology professors are to be held responsible for their acts of negligence. See Norton v. Argonaut Ins. Co., 144 So.2d 249 (La.App. 1 Cir.1962) (holding a nurse, who was in full control of administering a drug, liable); Malbrough v. Hamsa, 463 So.2d 639 (La.App. 5 Cir.1984), writ denied, 466 So.2d 472 (La.1985) (holding an assistant surgeon, who helped extensively in the planning and performing of the patient's surgery, liable); Favalora v. Aetna Cas. & Sur. Co., 144 So.2d 544 (La.App. 4 Cir.1962) (holding a radiologist, who was in full control of a patient undergoing a x-ray examination, liable); Aubert v. Charity Hospital of Louisiana, 363 So.2d 1223 (La.App. 4 Cir.), writ denied, 365 So.2d 242 (La.1978) (holding a first-year resident in anesthesiology, who was unsupervised and well-qualified to handle the installation of a endotracheal tube, liable); Butler v. Louisiana State Bd. of Educ., 331 So.2d 192 (La.App. 3 Cir.), writ refused, 334 So.2d 230 (La.1976) (holding a biology professor, who approved and supervised the withdrawal of blood from volunteer students, liable). While we acknowledge these decisions, we find all to be distinguishable from the present case in that, in each of those cases, the medical personnel involved had some degree of control in the procedures performed. In the instant case, Dr. Bueff was under the direct supervision and control of Dr. LaRocca.
In determining the standard of care applicable to a physician, medical testimony is persuasive, but not always controlling. Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94); 643 So.2d 1228. The supreme court held in Pfiffner that expert testimony is not even necessary for a plaintiff to meet his burden of proof. However, the court further stated that "in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794's requirements without medical experts...." Id. at 1234.
The applicable standard of care is determined from the particular facts of a case, including evaluation of the expert testimony. This is not one of those cases envisioned by Pfiffner where the responsibilities among the various participants in the surgical procedure are clear, or where Dr. Bueff performed an obviously careless act from which a lay person could infer negligence, or where he failed to attend a patient when the circumstances demonstrated the serious consequences of his failure. Additionally there is no testimony that he breached any applicable standard of care, or that he violated any statute or hospital policy. Id.
We find no case providing us with a judicial determination of the applicable standard of care for a physician studying in a fellowship program. Thus, we must formulate our own standard. Such a standard can best be determined from the testimony of medical experts who are familiar with the duties and responsibilities of a physician in fellowship training. We find that standard of care to be that which was unanimously agreed upon by the medical experts who testified in this matter. Such a physician is to follow the instruction and direction of the teaching physician, is to perform those tasks assigned to *338 him and to do so under the direct supervision and control of the teaching physician, and is to report anything which appears improper or out of the ordinary to the teaching physician.
Having determined the standard of care, we next turn to the question of whether Dr. Bueff breached that standard. In its reasons for judgment, the trial court concluded that "[t]here was no evidence that Dr. Bueff found anything out of the ordinary which he failed to report to Dr. LaRocca." This is a finding of fact which we cannot reverse absent manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Hebert relies totally on the testimony of Dr. Moshein, who is of the opinion that based on his review of the x-rays taken during the surgery of October 23, 1990, the right side screws were improperly placed. However, it was his opinion that misplacement of the screws is not malpracticebut that failure to recognize the misplacement is below the standard of care for the procedure. Again however, Dr. Moshein places that burden of discovery on Dr. LaRocca and not Dr. Bueff. It was his opinion that the intraoperative x-rays taken on the day of surgery, while not confirming that the screw was out of place, should have warranted further checking by Dr. LaRocca. He further admits that if Dr. LaRocca was truthful in stating his findings as a result of the surgery of March 28, 1991, then no malpractice occurred.
Dr. Andrew King, a New Orleans orthopaedic surgeon and a member of the medical review panel that found no fault on the part of either of the doctors, also testified. Part of the dispute in the litigation was whether Dr. LaRocca took both lateral and A/P x-rays in checking the alignment of the pedicle screws. Dr. King was of the opinion that even assuming that only a lateral x-ray was taken, the x-ray would have been sufficient to check the alignment, given the fact that he had the canal open and had "a laminectomy where you directly visualize the pedicle." His opinion concerning the doctors' actions, after reviewing evidence not before the medical review panel, did not change.
Another member of the medical malpractice panel, Dr. Raoul P. Rodriguez of the Tulane University Medical School in New Orleans, testified that he found no malpractice on the part of the two doctors in that he found no evidence that the screw ever penetrated through the pedicle and impinged on the nerve as alleged by Hebert. He based this opinion on the relief from pain obtained by Hebert after Dr. LaRocca removed the scar tissue in the second surgery and Dr. LaRocca's testimony that he observed no penetration in that surgery. In fact, Dr. Rodriguez was of the opinion that had the screw entered the spinal canal, this would be a complication of the surgery but not necessarily "a breach of a usual good practice of orthopaedic surgery." He expressed no opinion about the standard of care of a physician in a fellowship program.
The third member of the medical review panel, Dr. Baer I. Rambach, a Shreveport, Louisiana orthopaedic surgeon, was questioned concerning the failure to x-ray after the screws were in place. He testified that if he was satisfied with the pin placement, he would be satisfied with the screws and probably would not have had another x-ray made. Because of the quality of portable x-rays used in the operating theater, Dr. Rambach felt that the x-rays of the pin placement would be more important than anything else.
Dr. Cobb removed the plate on Hebert's left side in May of 1992 and was of the opinion that Hebert's fusion was solid throughout. When asked about the question of negligence or malpractice, the doctor responded, "I didn't really see any negligence. I think there was a complication that seemed to be appropriately responded to and dealt with but I didn't see where there was any negligence that I could identify."
There is no evidence that Dr. Bueff was faced with any situation arising in the surgery that required him to call it to Dr. LaRocca's attention. Even the x-rays relied on by Dr. Moshein were found to be within normal limits by the other physicians testifying. Faced with this overwhelming medical testimony that Dr. Bueff did not violate the standard of care imposed on him, we find that the trial court was not manifestly erroneous in its decision.

*339 DISPOSITION
For the foregoing reasons, the judgment of the trial court is affirmed in all respects. Costs of this appeal are taxed to Joey Hebert.
AFFIRMED.
NOTES
[1] The issue of the physicians' malpractice was presented to a Medical Review Panel in October of 1990. Dr. LaRocca died on September 26, 1992, or before an opinion was rendered by the Medical Review Panel and before this suit was filed on July 29, 1993. However, he testified by deposition before his death.
[2] This procedure was described in the record as one wherein there is an attempt to remove the damaged disc material with a needle.
[3] Dr. LaRocca testified that this was a generic term that had several components, which in Hebert's case included a failed lumbar surgery syndrome with chronic radiculopathy (leg pain because of nerve damage inside the low back), epidural fibrosis (scarring in the spinal canal from the past surgery and disc disease), and spinal stenosis (the space available inside the spinal canal was too small).
[4] Although neither Dr. LaRocca nor Dr. Bueff could recall which plate was attached by Dr. Bueff, both agreed that Dr. LaRocca normally worked from the left side of the patient.