780 So.2d 394 (2000)
Bernard Salvatore PIRO, Plaintiff-Appellant,
v.
Dr. John M. CHANDLER, Dr. James Kim and Bossier Medical Center, Defendants-Appellees.
No. 33,953-CA.
Court of Appeal of Louisiana, Second Circuit.
November 1, 2000.
Opinion on Rehearing February 28, 2001.
*395 Georgia P. Kosmitis, Shreveport, Counsel for Appellant.
Watson, Blanche, Wilson & Posner, Baton Rouge, By: Randall L. Champagne, Counsel for Appellee Bossier Medical Center.
Before BROWN, STEWART and PEATROSS, JJ.
STEWART, J.
In this medical malpractice action, the jury determined that the defendant, Bossier Medical Center ("BMC"), did not breach the standard of care in the treatment of Salvatore Piro, who died on July 31, 1995 while a patient at BMC. On appeal, Bernard Piro, the plaintiff and son of the deceased, argues that the jury erred in finding no breach of the standard of care. We agree and find that the jury was clearly wrong in finding no breach of the standard of care by BMC. Accordingly, we reverse the judgment of the trial court dismissing the plaintiff's action and remand for further proceedings on the merits of this claim.

FACTS
On the morning of July 13, 1995, Salvatore Piro, age 81, was admitted to BMC by Dr. Janet L. Morehouse, who was the oncall physician for Mr. Piro's treating physician, Dr. John Chandler. Admission to BMC was necessary because Mr. Piro, who had a long history of hiatal hernia and hypertension, was exhibiting symptoms of upper gastrointestinal bleeding. Upon admission to BMC, Mr. Piro underwent an esophagogastroduodenoscopy, or endoscopy, to locate the site of the gastrointestinal bleeding. The endoscopy revealed a Mallory Weiss tear and a large duodenal bulb ulcer. Mr. Piro required transfusion of four units of packed cells to replace blood lost from the bleeding. Following the endoscopy, Mr. Piro was transferred to a room. At about 3:30 p.m., Dr. Morehouse issued orders for Procardia, a medication used to decrease blood pressure, to be given to Mr. Piro up to every four hours if his blood pressure rose above 160/95, meaning a systolic measure greater than 160 and a diastolic measure greater than 95. Medical records indicate that Mr. Piro's blood pressure was taken around 4:00 p.m., at which time his blood pressure was 173/100. However, Procardia was not given to Mr. Piro until approximately 7:45 p.m. when his blood pressure was taken again and shown to be 170/100. Medical records also indicate that by 12:00 a.m. in the morning of July 14, 1993, nurses conducting the shift assessments could not arouse Mr. Piro. According to patient progress notes, Mr. Piro was exhibiting "strident sounding" respirations accompanied by "thick, mucousy rasping in [his] throat." His skin was noted to be "pale *396 and dusky." Dr. Morehouse was called to the hospital, breathing treatments were begun, and Mr. Piro was subsequently transferred to the intensive care unit ("ICU"). Dr. Morehouse suspected that Mr. Piro had suffered a stroke. A scan taken on July 14, 1995 revealed no evidence of hemorrhage or infarction. However, her suspicion was confirmed by a scan taken on July 16, 1995, which showed an infarct involving the pons area of the brain, primarily on the right side.[1] By July 18, 1995, the pontine infarct had extended to the mid and upper portion of the pons and there was an additional early small infarct involving the mid portion of the left temporal lobe. Mr. Piro remained in ICU and died on July 31, 1995. BMC's discharge summary attributes cause of death to "irreversible cerebral damage due to numerous cerebral infarctions."
On January 27, 1999, following an adverse medical review panel decision, Bernard Piro filed the instant medical malpractice action naming as defendants BMC, Dr. Chandler, and Dr. James Kim, a neurologist who treated Mr. Piro after he suffered the stroke. The claim against Dr. Kim was dismissed after the trial court granted summary judgment in his favor; Dr. Chandler settled with the plaintiff. The matter proceeded to trial on the claim remaining against BMC. The plaintiff's theory at trial was that Mr. Piro lost a chance of survival due to the actions of BMC's nursing staff, particularly in the failure to administer Procardia to Mr. Piro as ordered by Dr. Morehouse. This claim was rejected by the jury whose conclusion was that BMC did not breach the standard of care in its treatment of Mr. Piro. Accordingly, the trial court rendered a judgment dismissing the plaintiff's claim against BMC. This appeal followed.

DISCUSSION
In three assignments of error, the plaintiff asks us to review (1) whether the jury erred in its conclusion that BMC did not breach the standard of care in its treatment of Mr. Piro; (2) whether the trial court improperly dismissed jurors for cause, even after they stated they could be impartial despite previous negative experiences at hospitals; and (3) whether the trial court's instruction that the jury must find for BMC if the deceased would have suffered injuries regardless of BMC's actions was improper and contrary to the law regarding proof of a loss of a chance of survival. We will proceed to address the first assignment of error.

Applicable Law
In a medical malpractice action against a hospital, the plaintiff is required to prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached its duty, and that injury was caused by the breach. Smith v. State, through Department of Health and Human Resources, 523 So.2d 815 (La. 1988); Hunter v. Bossier Medical Center, 31,026 (La.App.2d Cir.9/25/98), 718 So.2d 636; Moore v. Willis-Knighton Medical Center, 31,203 (La.App.2d Cir.10/28/98), 720 So.2d 425. In brief, the plaintiff must prove the standard of care, the violation or breach of the standard of care, and the causal connection between the alleged negligence and injuries. Turner v. Stassi, 33,022 (La.App.2d Cir.5/10/00), 759 So.2d 299.
A hospital is bound to exercise the degree of care toward a patient that his or her condition requires and to protect the patient from external circumstances peculiarly within the hospital's control. The determination of whether a hospital has breached the duty of care owed a patient depends on the facts and circumstances of each particular case and is a question of fact for the jury. Moore, supra; Borne v. St. Francis Medical Center, 26,940 (La.App.2d Cir.5/10/95), 655 *397 So.2d 597, writ denied, 95-1403 (La.9/15/95), 660 So.2d 453. Similarly, the applicable standard of care is determined from the particular facts of a case, including evaluation of expert testimony. Corley v. State, through Department of Health and Hospitals, 32,613 (La.App.2d Cir.12/30/99), 749 So.2d 926; Hebert v. La-Rocca, 97-433 (La.App. 3d Cir.12/10/97), 704 So.2d 331.
In a medical malpractice action, great deference is due the jury's findings when medical experts express differing views, judgments, and opinions as to whether the standard of care was met. Hunter, supra. The jury's findings of fact should be upheld unless shown to be clearly wrong or manifestly erroneous. Moore, supra; Martinez v. Schumpert Medical Center, 27,000 (La.App.2d Cir.5/10/95), 655 So.2d 649. Reversal of the fact finder's determinations requires the appellate court to conclude that no reasonable factual basis exists for the fact finder's findings and to determine that the record establishes that such findings are clearly wrong or manifestly erroneous. Stobart v. State, through Department of Transportation and Development, 617 So.2d 880 (La.1993).

Trial Testimony
The plaintiff presented the testimony of Dr. E.J. Mayeaux, a family medicine practitioner who was not on BMC's staff in 1995. Dr. Mayeaux testified that the standard of care in 1995 required the use of Procardia as ordered by Dr. Morehouse to decrease blood pressure quickly, and thereby decrease the risk of stroke. According to Dr. Mayeaux, the order for Procardia was a "PRN" order, meaning one that is to be administered either at the patient's request or, as in this instance, when the patient meets certain criteria set by the physician. With regard to the standard of care pertaining to the administration of the medication by the nursing staff, Dr. Mayeaux testified that the standard of care required the nursing staff to give the patient the medication ordered in a timely manner. Dr. Mayeaux testified that blood pressure of 173/100 is not cause for emergency intervention. A delay of an hour in giving the Procardia would be expected and a delay of two to three hours would be possible. However, Dr. Mayeaux also testified that while he could not say with certainty that a breach occurred in this instance, a delay of three and one-half hours would fall outside the standard of care as to the administration of the Procardia as ordered by Dr. Morehouse.
Dr. Richard Wilson Fincher, a physician on staff at BMC and a specialist in internal medicine, pulmonary care, and critical care, treated Mr. Piro on July 14, 1995 when he was experiencing respiratory difficulties. As a blanket statement, Dr. Fincher testified that elevated blood pressure can increase the risk of stroke and that uncontrolled hypertension can worsen a stroke. Regarding the failure of the nursing staff to administer the Procardia to Mr. Piro until 7:45 p.m., even though Mr. Piro's blood pressure was above the criteria set by Dr. Morehouse when taken at approximately 4:00 p.m., Dr. Fincher testified that the medication should have been given within two to three hours.
The plaintiff also presented the testimony of nurses who treated Mr. Piro at BMC. Martha Bucker, a registered nurse who was on BMC's staff in 1995, testified that the standard of care for patients with hypertension requires that vital signs be monitored every four hours and that medication be given as ordered. Bucker's testimony indicated that Dr. Morehouse's order for Procardia was a PRN order and the medication ordered needed to be given, if available, when Mr. Piro's blood pressure was first taken and found to be 173/100. Bucker believed that the Procardia was not available on the floor at 4:00 p.m., and that the order for the medication was just faxed to the pharmacy at that time as indicated on the "Physician Orders" sheet. Bucker, who worked the 7:00 a.m. to 3:00 p.m. shift on July 13, 1995, could not state when the Procardia was *398 available from the pharmacy for administration to Mr. Piro.
Christina Hodges, a licensed practical nurse, worked the 11:00 p.m. to 7:00 a.m. shift on the evening of July 13, 1995. When asked whether the failure to give the Procardia when Mr. Piro's blood pressure rose above 160/95, as ordered by Dr. Morehouse, was below the standard of care, Hodges answered, "It would have been on my shift." Hodges also related that pursuant to hospital policy, the pharmacy has up to four hours to fill orders other than "stat" orders which must be filled within one hour or "NOW" orders which must be filled within two hours. However, Hodge also testified that thirty minutes to one hour would be a reasonable time to wait for the Procardia order to be filled and given to the patient once the order was faxed to the pharmacy.
Marian Waites, also a registered nurse at BMC, worked the 11:00 p.m. to 7:00 a.m. shift on the evening of July 13, 1995. Waites testified that the standard of care required the nursing staff to monitor Mr. Piro's blood pressure every four hours and to give the Procardia as ordered by Dr. Morehouse. Waites also referred to hospital policy as allowing four hours for the pharmacy to get ordered medications, other than "stat" or "NOW" orders, to the floor for administration to patients. According to Waites, the "Physician Orders" sheet in the medical records indicates that the Procardia order was faxed to the pharmacy at 4:00 p.m.; thus, the pharmacy had up to four hours to get the PRN-ordered medication to the patient's floor.
Eleanor Dell Howard was the registered nurse attending to Mr. Piro during the 3:00 p.m to 11:00 p.m. shift on July 13, 1995 when he was admitted to a room following the endoscopy. Howard testified that it is the nurse's responsibility to assess the patient for administration of PRN-ordered medications, such as Procardia. Howard admitted that the standard of care required her to give the Procardia to Mr. Piro when his blood pressure was elevated above 160/95. Howard did not believe that she took Mr. Piro's blood pressure reading at 4:00 p.m. when it was found to be 173/100 and did not know who took the reading. Howard could not state when she learned of Dr. Morehouse's order that Procardia be given to Mr. Piro when his blood pressure rose above 160/95 or when she learned of the elevated blood pressure reading taken at 4:00 p.m. It was Howard's testimony that Procardia was not a medication available on the floor. It had to be obtained from the pharmacy by faxing the doctor's order and then waiting up to three or four hours for the pharmacy to get the medication to the floor. Howard testified that "they" had probably just faxed the order for the Procardia to the pharmacy at 4:00 p.m. Although not certain, Howard testified that she probably took the second blood pressure reading at 7:45 p.m. and then gave Mr. Piro the Procardia.
BMC presented the testimony of Dr. Morehouse. Dr. Morehouse interpreted her order as requiring the nurses to monitor Mr. Piro's vital signs every four hours and give a dose of the Procardia up to every four hours if Mr. Piro's blood pressure rose above 160/95. She also testified that it would not be acceptable to wait up to four hours before administering the Procardia. Dr. Morehouse admitted that it is common to delay administering medication to a patient when the medication needs to be obtained from the pharmacy, but she stated that the Procardia should have been given earlier if the nurse was aware of the order and had the medication available. Although Dr. Morehouse believed the medical records showed the Procardia order was faxed to the pharmacy at 4:00 p.m., she could not say how long it took for the pharmacy to get the Procardia to Mr. Piro's floor.

Analysis
The testimony related above establishes the applicable standard of care. In this instance, the standard of care required BMC's nursing staff to monitor Mr. *399 Piro's vital signs every four hours and to administer Procardia to him, as ordered by Dr. Morehouse, if his blood pressure rose above 160/95. Dr. Morehouse's order was recorded at 3:30 p.m. on July 13, 1995 on the "Physician Orders" sheet. The blood pressure reading taken at approximately 4:00 p.m. showed Mr. Piro's pressure elevated to 173/100. Although Mr. Piro's blood pressure was within the parameters set by Dr. Morehouse's order for the administration of Procardia, the medication was not given to Mr. Piro until approximately 7:45 p.m. when his blood pressure was taken again and found to be 170/100. The testimony shows that a delay of three hours and forty-five minutes occurred from the time Mr. Piro's blood pressure was found to be elevated until the Procardia was given to him as per Dr. Morehouse's orders. The jury obviously determined that this delay was not a breach of the standard of care requiring the administration of medication as per the doctor's order. We find manifest error in this determination.
Even accepting the testimony that BMC's policy allows four hours for the pharmacy to get PRN-ordered medications to the floor and that the Procardia order was faxed to the pharmacy at 4:00 p.m. on July 13, 1995, we cannot find that this sanctioned delay establishes a four hour window for the administration of certain medications to patients. Moreover, we cannot find that this sanctioned delay justifies the failure of BMC's staff to administer the Procardia to Mr. Piro within a reasonable time of finding his blood pressure elevated to 173/100. The hospital policy regarding the time frame within which the pharmacy must get medications to the hospital's floors does not tell us the time frame within which nurses must act to follow doctors' orders regarding the administration of medications to patients. None of the witnesses testified that a delay of nearly four hours before administering the Procardia, once Mr. Piro's blood pressure was found to be elevated, was reasonable. Interestingly, the testimony regarding the faxing of Dr. Morehouse's order to the pharmacy and the pharmacyrelated delays was more striking for what was not said than for what was stated by the witnesses. Nothing in the record tells us when the Procardia was received on the floor from the pharmacy. BMC's position is that we should assume it took almost four hours, the time allowed by hospital policy, for the pharmacy to get the Procardia to Mr. Piro's floor and that administration of Procardia to Mr. Piro at 7:45 p.m. was, therefore, reasonable. This assumption is not supported by the record. The fact that Mr. Piro was given Procardia at 7:45 p.m., after his vital signs were monitored and his blood pressure found to be elevated, does not establish that no breach occurred when BMC's nursing staff failed to timely administer Procardia when Mr. Piro's blood pressure was found elevated at 4:00 p.m. in the afternoon. Still unanswered is when the Procardia was delivered from the pharmacy and why it was not administered sooner since Mr. Piro's blood pressure had been elevated since 4:00 p.m. These unanswered questions preclude a finding that BMC did not breach the standard of care.
Our thorough review of the record convinces us that the jury was clearly wrong to find that BMC did not breach the standard of care in its treatment of Mr. Piro. We find that the record establishes that the failure to give Procardia to Mr. Piro until almost four hours after his blood pressure was found to be 173/100 was contrary to Dr. Morehouse's orders and a breach of the standard of care. Because of this finding and reversal of the lower court's decision, we pretermit discussion of the other two assignments of error. An appellate court is permitted to determine facts de novo from the record and render a judgment on the merits, if possible, when it finds either reversible error of law or manifest error of a material fact. La. C.C.P. art. 2164; Rosell v. ESCO, 549 So.2d 840 (La.1989). However, in this instance, we believe the record is not sufficient *400 to make findings as to the loss of a chance of survival alleged by the plaintiff to have resulted from BMC's breach of the standard of care. Moreover, the parties have not addressed or argued the issues of causation or damages on appeal. Having found a breach of the standard of care, we hereby remand the matter to the trial court for further proceedings on the issues of causation and damages.

CONCLUSION
We hereby reverse, at appellee's costs, the judgment of the trial court and remand for further proceedings on the merits of this claim.
REVERSED AND REMANDED.

ON REHEARING
STEWART, J. (on Rehearing).
The plaintiff, Bernard Salvatore Piro, appealed the dismissal of his medical malpractice action against Bossier Medical Center ("BMC") after a jury concluded that BMC did not breach the standard of care in its treatment of his father, Mr. Salvatore Piro, who suffered a stroke and died while hospitalized at BMC. In an opinion rendered November 1, 2000, we found the jury's determination to be manifestly erroneous. Accordingly, we reversed the trial court's judgment of dismissal and remanded the matter for further proceedings to address the issues of causation and damages.
Within the delays allowed by law, BMC filed an application for rehearing which was granted. On rehearing, BMC argues that we exceeded the scope of appellate review by finding manifest error in the jury's determination that no breach occurred. BMC also argues that the record is sufficient for this court to determine the facts de novo and render judgment on the merits of the plaintiff's claim. BMC contends that if the record lacks sufficient evidence to make findings as to the plaintiff's claim of loss of a chance of survival, then the plaintiff failed to meet his burden at trial and judgment in its favor is appropriate. In response, the plaintiff argues both that this court correctly found manifest error in the jury's determination and that the record clearly establishes a causal link between the breach of the standard of care and Salvatore Piro's decreased chance of survival. After careful reconsideration of the record, and for the reasons set forth herein, we affirm the trial court's dismissal of the plaintiff's claim.
The facts pertaining to Salvatore Piro's hospitalization and treatment are set forth in our original opinion. We held that the failure of BMC's nursing staff to give Procardia to Mr. Piro until almost four hours after his blood pressure was found to be 173/100 was contrary to the orders of Dr. Morehouse, the treating physician, and a breach of the standard of care requiring the administration of medication as per the doctor's orders. Upon reconsideration of the record, we again conclude that it was manifest error for the jury to find otherwise. The trial testimony clearly established the standard of care and the breach thereof. Dr. Morehouse issued orders for BMC's nursing staff to monitor Mr. Piro's vital signs every four hours and to administer Procardia to him if his blood pressure rose above 160/95. These orders were recorded at 3:30 p.m., on July 13, 1995 on the "Physician Orders" sheet. At 4:00 p.m., Mr. Piro's blood pressure was taken and recorded as 173/100, but the medication was not given to him until almost four hours later when his blood pressure was again taken and found to be 170/100.
Having concluded that BMC breached the standard of care, we must now determine whether a causal connection exists between the breach and the injury sustained, which in this instance is alleged to be a loss of a chance of survival. See Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991). When appellate review reveals either reversible *401 error of law or manifest error as to a material fact, the appellate court is permitted to determine facts de novo from the record and render a judgment on the merits, if possible. La. C.C.P. art. 2164; Rosell v. ESCO, 549 So.2d 840 (La.1989); Gordon v. Willis Knighton Medical Center, 27,044 (La.App.2d Cir.6/21/95), 661 So.2d 991, writ denied, 95-2776 (La.1/26/96), 666 So.2d 679. Both parties aver that the record is complete for purposes of a de novo determination of causation and damages.
The burden is on the plaintiff to prove causation in a medical malpractice action by a preponderance of the evidence. Martin v. East Jefferson General Hospital, supra. Where a patient dies, the plaintiff does not have to meet the "unreasonable burden" of proving the patient would have lived if proper treatment had been given. Instead, the plaintiff need only prove that the patient was denied a chance of survival because of the improper treatment. Martin v. East Jefferson General Hospital, supra; Smith v. State, Through Dept. of Health and Human Resources Admin., 523 So.2d 815 (La. 1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986); and Gordon v. Willis Knighton Medical Center, supra.
The record establishes that Mr. Piro, age 81, entered BMC on July 13, 1995, exhibiting symptoms of vomiting and gastrointestinal bleeding. He underwent an endoscopy, and he received a transfusion of four units of packed cells. Mr. Piro was expected to remain in the hospital for three to five days. The breach occurred after Mr. Piro was admitted to a room following the endoscopy. As explained previously, Mr. Piro was not given medication in accordance with his physician's orders until almost four hours after his blood pressure was found to be elevated. However, after Mr. Piro received the medication, his blood pressure returned to normal ranges. During the early evening hours, Mr. Piro exhibited symptoms of nausea, spitting, and sleepiness. Mr. Piro choked and spit out medication given to him. Orders were issued allowing him to have ice chips only and medication was administered to him to address the nausea. Dr. Janet Morehouse, Mr. Piro's treating physician at the time, was not alarmed at his condition. She testified that sleepiness following an endoscopy was not unusual. She further testified that she was not alarmed by complaints of nausea. She explained that it would not be unusual for a patient, who has had a tube down his throat and who has undergone some sedation, to experience throat irritation with choking and spitting up. She also testified that the appearance of paleness and poor turgor would also not be unexpected in a patient of Mr. Piro's age who has undergone an endoscopy. Unfortunately, Mr. Piro's condition deteriorated when he suffered a stroke sometime during the late evening hours. By 12:00 a.m., on the morning of July 14, 1995, Mr. Pior was exhibiting "strident sounding" respirations and "thick, mucousy rasping" in his throat. He was transferred to ICU after Dr. Morehouse came to believe that he had suffered a stroke.
What must be determined from these facts is whether the breach, namely, the failure to administer the Procardia as ordered by Dr. Morehouse, increased Mr. Piro's likelihood of suffering a stroke and therefore decreased his chances of survival. Testimony established that high blood pressure or hypertension is a known risk factor for stroke. Testimony also established that, at the time in question, Procardia was administered as ordered by Dr. Morehouse to quickly reduce blood pressure and thereby decrease the risk of stroke. However, the testimony further established that Mr. Piro suffered a thrombotic stroke, which is not commonly associated with hypertension.
Dr. E.J. Mayeaux, a practitioner of family medicine and a member of the medical review panel in this case, testified on behalf of the plaintiff. On direct examination, *402 Dr. Mayeaux agreed that the breach of the standard of care would increase the risk of stroke and decrease Mr. Piro's chance of survival. On cross examination, Dr. Mayeaux referred to other possible risk factors for stroke, such as stress due to loss of blood and the endoscopy procedure. Dr. Mayeaux also explained the difference between a hemorrhagic and a thrombotic stroke. According to Dr. Mayeaux, a hemorrhagic stroke involves the breaking of a blood vessel in the brain due to a build up of pressure. This type of stroke is clearly related to hypertension and is the type of stroke with which people are most familiar. A thrombotic or embolic stroke occurs when something blocks the blood supply. Vascular disease, cholesteral, hypertension, and smoking are causes over time. Significantly, Dr. Mayeaux indicated that the receipt of blood products by itself is a known risk factor for thrombotic strokes. It was Dr. Mayeaux's opinion that Mr. Piro suffered a thrombotic stroke. This opinion was based on review of CT scans taken beginning on July 14, 1995. The first scan showed nothing. This ruled out the possibility of an hemmorrhagic stroke which would have been immediately apparent. However, it was apparent that a thrombotic stroke occurred when another scan was taken on July 17, 1995. When questioned about the specific role of hypertension in causing thrombotic strokes, Dr. Mayeaux explained that long-term hypertension has some bearing in the cause of thrombotic strokes in that high blood pressure can lead to the destabilization of plaques in blood vessels. He went on to state:
So if the question were to be posed, does it have no bearing, I would have to say no. If you're asking me is it one of many possible sources, I would have to say yes. If you're saying is it the most likely cause, I would have to say no.
Dr. Mayeaux concluded that, more probably than not, the delay in giving the Procardia to Mr. Piro did not play a clinically significant role in his stroke and that his stroke was probably not precipitated by hypertension. Dr. Mayeaux offered no opinion as to whether the breach in this instance increased the risk of incurring a thrombotic stroke. Dr. Mayeaux did opine that once Mr. Piro suffered the stroke, there was very little to be done to treat him due to his age and condition. In fact, Dr. Mayeaux explained that the chance of recovering from a serious stroke in the pontine area is less than five percent, and survival would likely leave the patient in a persistent vegetative state.
Dr. Richard Wilson Fincher also testified on behalf of the plaintiff. Dr. Fincher, a specialist in internal medicine, pulmonary care, and critical care, treated Mr. Piro for respiratory difficulties on July 14, 1995. Referring to it as a "blanket statement," Dr. Fincher stated that "elevated blood pressure can increase the risk of stroke." He also indicated that uncontrolled hypertension can worsen any stroke. With regard to the type of stroke suffered by Mr. Piro, Dr. Fincher indicated that scans taken on July 16,1995 showed an infarction in the pons area of the brain. There was no evidence of a bleed, which would have suggested an hemmorrhagic stroke. He opined that the infarction was most likely due to a clot. He also opined that those who have a stroke in the pons area have a greater than sixty percent mortality rate and that, as indicated by Dr. Mayeaux, survival is likely to be in a vegetative state.
The defense presented the testimony of Dr. James Wainwright Thompson, a practitioner of family medicine with experience treating patients who suffer from hypertension and who have suffered strokes. Dr. Thompson testified, as did the other experts, that Mr. Piro suffered a thrombotic stroke in the pons area of the brain caused by plaque blocking a blood vessel. He did not believe that the stroke was hemmorrhagic or that it was caused by acute changes in Mr. Piro's blood pressure. It was Dr. Thompson's opinion that elevated blood pressure over a significant period *403 of time could extend a stroke, but he believed that the blood pressure would have to be higher than what Mr. Piro experienced. He suggested that the systolic pressure would have to be in excess of 200 and the diastolic in excess of 100. Dr. Thompson believed that any extension of Mr. Piro's initial stroke was part of the natural disease process and not attributable to his blood pressure.
Finally, Dr. Janet Morehouse, Mr. Piro's treating physician during his hospitalization, testified that Mr. Piro suffered a thrombotic stroke as evidenced by a CT scan taken on July 16, 1995. The scan revealed a large infarction in the pons area. Dr. Morehouse believed that the possibility of an hemmorrhagic stroke was ruled out with the first scan. Later scans revealed extension of the pontine infarct. Dr. Morehouse could not give a cause for the extension, but merely explained that no "rhyme or reason" exists as to why some strokes extend while others do not. As to the cause of Mr. Piro's stroke, Dr. Morehouse opined that high blood pressure probably played no part at all and indicated that high blood pressure usually results in bleed or hemmorrhagic strokes. Her belief was that his stroke resulted from a clot. Dr. Morehouse also opined the Mr. Piro's hypertensive episode did not make the stroke worse. Again, this opinion was based on her belief that the type of stroke he suffered was not attributable to high blood pressure. Dr. Morehouse did agree that, over time, high blood pressure is a risk factor for stroke.
Based on the above testimony, we cannot conclude that the plaintiff met the burden of proving causation in this instance. The record does not establish that Mr. Piro was denied a chance of survival due to improper treatment. The record establishes the commonly known fact that hypertension or high blood pressure is a risk factor for stroke. The record further establishes that Procardia was to be given to Mr. Piro to decrease his blood pressure and thereby decrease the risk of stroke. However, the record does not relate the hypertensive episode experienced by Mr. Piro and the delay in medication to the stroke which he suffered. All experts agreed that Mr. Piro suffered a thrombotic stroke, rather than the hemmorrhagic stroke more commonly associated with high blood pressure. The testimony indicates that high blood pressure over the long-term acts as a risk factor for thrombotic stroke. The testimony did not indicate that an acute hypertensive episode could cause a thrombotic stroke or worsen it. Mr. Piro had a history of hypertension and had received a transfusion earlier that day. Both a history of hypertension and the receipt of blood products are risk factors for thrombotic stroke. Considering the presence of these factors, the fact that stroke is the type of injury that commonly occurs in the absence of negligence, and the lack of an actual causative link between the failure to administer the Procardia earlier and the stroke suffered by Mr. Piro, we do not find the evidence sufficient to prove by a preponderance that BMC's negligence caused Mr. Piro to lose a chance of survival.
For these reasons, we hereby affirm the judgment of the trial court in favor of BMC. The plaintiff's claims are dismissed and costs of appeal are assessed against him.
AFFIRMED.
NOTES
[1] According to testimony, the pons encompasses the lower part of the brain above the base of the skull and controls neurological functions, such as involuntary movements.